UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

In re:                              )
                                    )
BLUE BEAR FUNDING, LLC.,            )        Case No. 05-31300 ABC
                                    )        Chapter 11
Debtor.                             )

UNITED STATES TRUSTEE'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE OR,
IN THE ALTERNATIVE,
TO CONVERT CASE TO A CHAPTER 7 CASE

The United States Trustee moves this Honorable Court, pursuant to 11 U.S.C. §§ 1104 and 1112(b), to authorize him to appoint a Chapter 11 trustee, or in the alternative, to convert the above-captioned case to a case under Chapter 7 of the United States Bankruptcy Code, and in support of thereof states and alleges as follows:

1. A Chapter 11 trustee may be appointed on the motion of a party in interest at any time subsequent to the filing of the case but prior to the confirmation of a plan of reorganization for cause including: 1) pre- or post-petition "fraud, dishonesty, incompetence, or gross mismanagement" of the debtor's financial affairs by its current management; or 2) if the appointment of a Chapter 11 trustee is in the best interest of creditors. The appointment of a Chapter 11 trustee is an extraordinary remedy but if cause is shown then the appointment is mandatory. *Oklahoma Refining Co. v. Blaik*, 838 F.2d 1133 (10th Cir. 1988).

2. "Dismissal under [11 U.S.C.] §1112(b)(2)[(2004)] is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason." *Hall v. Vance (In re Hall)*, 887 F. 2d. 1041, 1044 (10th Cir. 1989). An inability to effectuate a plan arises /when the "debtor lacks the capacity to formulate a plan or to carry one out." *Id.* A Chapter 11 case shall be converted or dismissed, absent "unusual circumstances," where the debtor has suffered "substantial or continuing loss to or diminution of the estate and [there is an] absence of a reasonable likelihood of rehabilitation" under 11 U.S.C. § 1112(b)(4)(A), as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 108-9.

3. Cause exists to appoint a Chapter 11 trustee or to convert this case given the history of fraudulent conduct in this case, the postpetition continuation of Mr. Karst

in management where Mr. Karst participated in the fraud and gross mismanagement of the Debtor, its continuing losses on accrual basis, minimal net cash flows and the absence of a reasonable likelihood of rehabilitation.

## **BACKGROUND**

4.   The above-captioned case was filed as a voluntary Chapter 11 case on August 22, 2005.

5.   Blue Bear Funding LLC , the "Debtor," is a Colorado limited liability company which was organized in 2003, as 1st American Factoring, LLC, to provide account receivables factoring services to businesses.  The Debtor has operated for less than two years as a factoring company.

6.   The Debtor's primary market is in the Northeast quadrant of the state of Colorado, including the Fort Collins and Greeley areas. Its client businesses are primarily small companies with "sub-prime"credit which need to raise working capital but which are not able to obtain "working capital" loans or to factor their accounts with a larger factoring company.[1]

7.   The capital for these factoring activities was primarily raised through thirteen Independent Factoring Companies, "IFCs."  Nine of these thirteen IFCs continue to operate.  The remaining four IFCs were unable to raise sufficient capital to commence operations and the "investors" therein were repaid shortly after it was evident that these IFCs could not start operations.

8.   The "investors" in the various IFCs were primarily, if not exclusively, unsophisticated investors many of whom reside in the greater Fort Collins and Greeley areas of Colorado.  Most of these investors invested significant portions of their personal savings, including "retirement" funds, in this venture.  At least one investor was a church which invested a large sum from its endowment funds.

9.   The Debtor's membership interests are owned as follows:

A.      Blue Bear Financial, Inc. (45%);
B.      KFG, LLC (45%);
C.      DKD Connections, LLC (5%); and
D.      Key Connections, LLC (5%).

10.     The ownership of these entities can be summarized as follows:

---

[1] Some of the Debtor's clients are apparently affiliated with large corporations.  However, non of the clients appears to be a large business.

A.   Blue Bear Financial, Inc. — Russell Disberger and Steven Short each own a 50% interest;

B.   KFG, LLC  — Wholly owned by David Karst;

C.   Key Connections, LLC  — Gerry and Peggy Makey are each 50% members; and

D.   DKD Connections, LLC. — Don and Chris Donahoo are each 50% members.

11.    Key Connections, LLC and DKD Connections, LLC provide support services to the Debtor on behalf of the IFCs.

12.    The Donahoos and Makeys are also "executive directors" of some of the IFCs.  They remain active in the administration of the IFCs and the Debtor's business interests.  Mr.  Short is also an investor in an IFC.

13.   Mr.  Dishberger had originated the idea for forming the IFCs but is not active in the day to day operations of the Debtor's business.

14.   The Debtor has been managed by John E.  Davis as chief operating officer since February 1, 2005.  Mr.  Davis has no equity interest in the Debtor.  He was hired in September 2004 as a salesmen for factoring services and was elevated to the Chief Operating Officer role in late January 2005.

15.   Mr.  Karst apparently remains  as the nominal Chief Executive Officer of the Debtor.  The members other than KFG, LLC have sought to strip Mr.  Karst of any and all management powers in the Debtor and have also apparently attempted to prevent Mr.  Karst from exercising any voting power as a member of the Debtor.

## Securities Issues

16.   The IFCs were organized to solicit investors for the Debtor's business.  The testimony of Mr.  Davis at the §341 meeting of creditors and in court indicates that each IFC was designed to solicit not more than 35 "accredited" and 35 "non-accredited" investors in order to avoid the disclosure requirements of applicable federal law.

17.   The investors in the IFCs were personally solicited by various IFC managers, including the Donahoos and Makeys, who are themselves substantial investors in the Debtor's business.  These investors were promised high interest

returns on promissory notes, issued in $5,000 increments,  whose proceeds were ostensibly to be invested in acquiring accounts receivable from factoring clients.

18.   Under applicable Colorado and federal law, "An investment contract under the Securities Act of 1933 means a contract, transaction or scheme by which a person (1) invests his or her money(2) in a common enterprise (3) with the expectation of profits from the efforts of other .  *See, Securities & Exchange Comm*ission *v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 110, 90 L.Ed.  1244 (1946) [citation omitted]. These third-party efforts must be significant, that is, essential managerial efforts that affect the success or failure of the enterprise [citation omitted]." *Joseph v. Viatica Management, LLC,* 55 P.3d 264, 266 (Colo.App.2002).  "The definition of a 'security' in § 11-51-102(14), C.R.S. § 1987 Rep.  Vol 4B), includes any 'investment contract.' An investment contract exists when (1) an individual invests money, (2) in a common enterprise, and (3) is led to expect profit derived from the entrepreneurial or managerial efforts of others [citations omitted]." *Griffen v. Jackson*, 759 P.2d 839, 842 (Colo.App.  1988).  "Investment contracts" can, and often do, include purported loans. *Id.*  "Colorado's statutory definition of the term 'security' includes 'any note . . . evidence of indebtedness . . .  participation in any profit sharing agreement . . . investment contract or, in general any interest or instrument commonly known as a security . . .' §11-51-102(12), 4 C.R.S. (1973).  The definition is virtually identical to the definition of 'security' in the federal securities act.  *See* 15 U.S.C. § 77b (1) (1982)."[2] *People v. Milne*, 690 P.2d 829, 833 (Colo. 1984).

19.   Mr. Davis' testimony and the representations of counsel at the September 30, 2005 meeting of creditors pursuant to 11 U.S.C. §341 was that none of the IFC managers was a licensed broker-dealer or sales representative authorized to sell securities under applicable securities laws.  Consequently, since investment contracts implicate the various securities laws, it would appear that the Debtor may have claims under the securities laws against its members and/or their affiliates.

20.   The Makeys, Donahoos, Mr.  Short and Mr.  Karst each are members of the Debtor.  Each of these individuals are also affiliates of one or more of the IFCs as a member owner in an IFC and/or as the owner of a member of one or more IFCs.

21.   Mr.  Davis is therefore in the untenable position of the being beholden to individuals who control the targets of the of many of the Debtor's possible litigation claims, including avoidance actions.  Given this unconscionable conflict of interest, Mr.  Davis is unlikely to be able to carry out his fiduciary duties as the Debtor's chief operating officer for the benefit of **all** creditors/investors including those who received distributions when others did not.

---

[2]This definition was recodified and slightly amended in 1990 and is now found at C.R.S. § 11-51-201(17) (2004).

22.   Mr.  Davis' lack of an ownership interest in the Debtor places him in the potentially untenable position of serving at the will of each of the other members besides KFG, each of whom holds a sufficient membership interest to deadlock the membership or to remove Mr.  Davis.

23.   Mr.  Davis' precarious position alone states cause for the appointment of an independent trustee who can serve without the risk of displacement by members who may legitimately be the targets of investigation in this case and by various regulatory and law enforcement officials.

24.   Mr.  Davis' inability to act as an independent fiduciary states cause to appoint a Chapter 11 trustee.  *See, In re Colorado-Ute Electric Ass'n, Inc.*, 120 B.R. 164 (Bankr.D.Colo.1990).

25.   Overwhelming cause by clear and convincing evidence exists in this case for the appointment of a trustee for other reasons as well.

## Failure to Oust David Karst

26.   The Debtor has consistently alleged that David Karst improperly diverted a large proportion of the Debtor's capital to Karst's affiliates through loans to the affiliates, the acquisition of accounts receivable of affiliates that did not meet appropriate investment standards, and other questionable transactions.

27.   The Debtor has further alleged that the capitalization from National Cash Flow Systems in December 2003 with $7.3 million of factored accounts was a fraudulent transaction in light of the fact that much of the $7.3 million value was based upon valuing impaired assets at full value as if these assets were not impaired and worth far less than the values listed for these assets.

28.   The Debtor has further alleged that some of the Karst affiliates were not legitimate businesses to begin with.

29.   The Debtor has also alleged that Mr.  Karst caused various legal documents to be drafted which gave the appearance of securing various debts owed by his affiliates to the Debtor but which did not actually secure these debts for the Debtor. The Debtor has also alleged that some of the documents which would have secured various transactions were never properly recorded thereby leaving the Debtor without the promised security.

30.   Mr.  Davis testified to the Court and at the meeting of creditors that the Debtor has approximately $10 million of impaired loans to Mr. Karst and his

affiliates.  Several of these loans took place while Mr.  Davis was employed by the Debtor.

31.  Despite all of the Debtor's allegations of claims against Mr.  Karst and his affiliates it has taken no action to remove him as its chief executive officer other than obtaining the return of the company laptop which Mr.  Karst had had in his possession.

32.  The Debtor's failure to remove Mr.  Karst as its chief executive officer creates an unacceptable risk that Mr.  Karst will interfere with the prosecution of the Chapter 11 case and that Karst will interfere with the prosecution of the Debtor's claims against him and his affiliates.

33.  The "movement of funds between the debtor and related entities" is one of the factors which a court should consider in deciding whether to appoint a Chapter 11 trustee.  *In re Rivermeadows Associates, Ltd.*, 185 B.R. 615, 617 (Bankr.D.Wyo.1995), *citing, In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr.S.D.N.Y.1990).

34.  The continuing failure to remove Mr.  Karst states further cause for the appointment of a Chapter 11 trustee.  *See, Oklahoma Refining Co. v. Blaik*, 838 F.2d 1133 (Cause for the appointment of a Chapter 11 trustee existed where debtor had failed to make serious efforts to collect from affiliates and was in an awkward situation of having to sue its own affiliates).

## Prepetition Conduct of Management

35.  Mr.  Davis has represented to the Court that both of the auditing firms hired by the Debtor prepetition have opined that the preparation of audited financial statements for the Debtor would be extremely expensive and may not even be possible.  Without establishing this "base line" it is extremely unlikely that the Debtor will be able to solicit additional capital to even maintain its current business much less expand it as would be necessary to pay a reasonable dividend.

36.  Mr.  Davis has also represented to the Court that the Debtor commingled funds from all sources thereby using funds which were those of the various IFCs to pay the Debtor's expenses, including exorbitant salaries to Mr.  Karst and his affiliates, and to pay investors of one IFC with funds of other separate IFCs.

37.  More troubling, is that one IFC, Sierra Funding, was purportedly  run by a close business and social friend of Mr.  Karst.  Investors in this IFC received significantly greater distributions, and therefore considerably lower losses to date,

than the investors in other eight "active" IFCs.  As an example, the remaining claims for Sierra investors are estimated at $457,662.81.  The claims for the other operating IFCs range from $675,124.63, for Midwest, to $4,127,942.80 for Provision.  Sierra received distributions totaling $887,351.83 during February 2005 and $914,429.67 in March 2005 while Mr.  Davis was the Debtor's chief operating officer.  Tens of thousands of dollars were distributed weekly to Sierra and its investors during this time. These very large distributions substantially reduced the investor balances in Sierra accounts.  None of the other IFCs shows a similar pattern of large distributions. This suggests that the Sierra investors may have had inside information about the Debtor's precarious financial condition because its manager's relationship to Mr. Karst.  These transfers occurred at a time when Mr.  Davis was the chief operating officer of the Debtor and should have been in position to stop purported preferential an/or fraudulent payments being made to Sierra investors.

38.  Mr.  Davis' representations reflect an absence of sound business judgment by the Debtor's prepetition management, *i.e.* , Mr.  Karst and his associates,  and Mr. Davis from February 1, 2005 onward  thereby cause for the appointment of a Chapter 11 trustee.  *Rivermeadows,* 185 B.R. *at* 619.

39.   Mr.  Karst's conduct appears to have been fraudulent, dishonest and incompetent.  Mr.  Karst remains as the chief executive officer.  Therefore, cause exists because "current" management engaged in "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor." 11 U.S.C. § 1104(a)(1).

### Best Interests of Creditors

40.  On October 14, 2005, Mr.  Davis testified that based upon the Debtor's current financial performance that is has net income, after the payment of bankruptcy related professional fees, which would not allow it to repay its investor creditors in full in less than 35 years.  Even this assumed many conditiions including the Debtor's ability to raise adequate capital and maintain and replace its factoring clients in order to maintain its current financial status.

41.  Mr.  Davis expressed confidence that he could raise $5 million in additional capital to invest in the Debtor's legitimate factoring business and thereby increase its net income to a level which would enable the Debtor to repay its investors within a more reasonable time.  But given the current allegations of massive fraud and the fact that even before the fraud was discovered the Debtor was resorting to soliciting investments from unsophisticated investors and that traditional lenders would not provide funds to the Debtor, it is not realistic to expect that such capital investment sources can be found.

42.  In his October 14, 2005 testimony Mr.  Davis also estimated that the

Debtor could prosper with a client base of only fifty factoring clients.  It currently has only about fifteen factoring clients.

43.  Mr.  Davis was even unable to testify about whether there were sufficient potential clients in the Debtor's target market to enable it to achieve the fifty client base and preserve its margins.

44.  Although Mr.  Davis' optimism is laudable, and he may have the support of some of the investor-creditors, it is critical that an independent third party, *i.e.*, a trustee, be put in place to assess whether the Debtor has any realistic prospect of repaying creditors a reasonable dividend with a reasonable time.  The areas of analyses that the trustee must undertake, either personally or through competent professional persons, include:

A.    The value of claims against insiders including the Debtor's members and their beneficial owners;

B.    The Debtor's reasonable prospects for achieving its necessary marketing goals for the factoring business;

C.    The desirability of the continuance of the Debtor's business;

D.    Whether the Debtor's business does, or even can, comply with applicable law including the securities laws of the state of Colorado and the United States;

E.    Whether the Debtor is current with all of its tax liabilities;

F.    Whether the Debtor is current with any and all of its reporting requirements; and

G.    Whether cause exists for the referral of matters to appropriate regulatory and law enforcement officials.

45.  Mr.  Davis has inherent conflicts in performing some of these tasks.  He also has limited, if any,  expertise in some of the areas covered in the previous paragraph.

46.  It is in the best interests of creditors that an experienced disinterested Chapter 11 trustee be appointed to provide the Court, the creditors and other parties in interest with the evaluations required to provide realistic analyses of the Debtor's financial condition and prospects.

47.  In the alternative, the conversion of this case is appropriate where the size of the Debtor's "core" factoring business is insufficient to allow a reasonable prospect of a reasonable dividend to creditors within a reasonable time over and above what they would receive in a Chapter 7 liquidation.

WHEREFORE, the United States Trustee prays this Honorable Court authorize him to appoint a Chapter 11 trustee or, in the alternative, convert this case to a case under Chapter 7 of the Bankruptcy Code  and grant him such other and further relief as may seem just under the circumstances.

Dated: 1 November 2005

Respectfully submitted,
CHARLES F. MCVAY

By:  *Leo M. Weiss*

Leo M. Weiss, #15294
999 18th Street, Suite 1551
Denver, CO 80202
Voice: (303) 312-7244
Fax: (303) 312-7259
Leo.M.Weiss@usdoj.gov

# CERTIFICATE OF MAILING

I hereby certify that a copy of the attached MOTION TO APPOINT A CHAPTER 11 TRUSTEE OR TO CONVERT CASE AND L.B.R. 202 NOTICE were mailed, postage prepaid, the date set forth below, to the following:


Anthony J. Espinoza
4080 E. 119th Place, Unit B
Thornton, CO 80233

John H. Miller
1108 Parkwood Dr.
Ft. Collins, CO 80525

Richard D. Brighi
366 N. Brisbane Ave.
Greeley, CO 80634

Lee Sommers
5101 Nelson Ct.
Ft. Collins, CO 80528

Allen J. Piepho
2302 Coal Creek Ct.
Ft. Collins, CO 80528

Kenneth F. Reiter
39342 Rangeview Dr.
Ault, CO 80610

Dell Babbit
1510 Flower Ln.
Estes Park, CO 80517

Douglas Jessop, Esq.
303 E. 17th Ave, #930
Denver, CO 80203
jmail@jessopco.com

Risa Wolf-Smith, Esq.
Holland & Hart
P.O. Box 8749
Denver, CO 80201
swalter@hollandhart.com

Blue Bear Funding, LLC
c/o John E. Davis
501 Main Street
Windsor, CO 80550

Dated:        November 1, 2005.

**<u>s/ Bev Smith</u>**
Office of the U. S. Trustee