UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: | ) |
| | ) |
| Blue Bear Funding, LLC | ) Case No. 05-31300 ABC |
| f/k/a 1st American Factoring, LLC | ) |
| EIN: 200063205 | ) Chapter 11 |
| | ) |
| Debtor. | ) |

**UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION**

The United States Trustee objects to the confirmation of the Debtor's and Official Unsecured Committee's Joint Proposed Plan of Reorganization and as his objection states as follows:

1. On August 22, 2005, the Debtor filed a voluntary petition for Chapter 11 relief under the United States Bankruptcy Code.

2. The Debtor is a factoring company that provides working capital for business borrowers who do not qualify for typical accounts receivable financing from banks.

3. The Debtor, originally named 1st American Factoring, LLC, was created on June 27, 2003, as a Colorado limited liability company. On May 21, 2004, the Debtor changed its name from 1st American Factoring to Blue Bear Funding, LLC.

4. The Debtor's core factoring business has operated with modest profits during the course of its case. The trend in its revenues appears to be stable at best and perhaps downward despite the infusion of funds from post-petition borrowing which were to be used to "grow" the business. The Debtor's 2006 revenues for recent months include: February 2006- $136,274.36, March 2006- $65,876.71, April 2006- $21,555.54, May 2006- $20,316.71, and June 2006- $14,310.19. This decline reflects poorly on the Debtor's ability to prosper, realize its financial projections, and pay dividends to holders of common stock issued to Class 7 claimants.

5. The Plan projections require $300,000 in new cash infusions before December 2006 just to enable the Debtor to meet its cash requirements. As such, the Joint Plan appears to neither be feasible nor in the best interest of creditors. This core factoring business has never been large and even if the Debtor's projections are met would not yield a substantial dividend to creditors. Indeed, the Joint Plan does not require the Reorganized Debtor to pay any dividend to investors unless the net proceeds **from the litigation exceed $1.5 million**. The Plan, as proposed, does not provide any assurance that investors will be paid anything **even if the business is profitable**.

6. By separate objection the United States Trustee has objected to the Debtor's settlement

agreement with various IFCs. If that settlement is not approved the Debtor will have to seek other sources of funding for its proposed litigation. The administrative costs in this case have been very high and its professional fees and expenses are projected to continue post-confirmation to be incurred at a very high level to sustain due to the high cost of its proposed litigation  It is not clear that there is a reasonable likelihood of recovering sufficient proceeds from litigation to offset both its costs and to return investors at least as much as the investors would obtain from a pro rata distribution from the proceeds of from the liquidation of Debtor's available assets, *i.e.*, The Debtor must recover at least $500,000 plus some reasonable imputed interest rate over and above the expense of litigation for investors to be as well off as they would be if the litigation were not pursued.

7. The UST has doubts about the Debtor's abilities to timely pay the amounts owed administrative claimants. Specifically, the Debtor's June 2006 Monthly Operating Report lists as of June 30, 2006 that certain administrative claimants are owed $1,020,809 as follows: Debtor's counsel - $720,794, Counsel for the Unsecured Creditors' Committee- $275,653, accountant- $20,612, and UST's fees- $3,750. The Plan provides that once the Joint Plan is confirmed the Reorganized Debtor will have to quickly pay a significant amount of the accrued fees and expenses owed these claimants. The Plan provides for payment to Jessop & Company, P.C. on the Initial Distribution Date of 50 % of the fees and expenses owed and the balance paid in six equal monthly payments of principal and interest.  The Debtor is obligated to pay the other administrative claims in cash on the later of the Effective Date or within twenty business days after the date these claims become Allowed Claims. The Debtor lacks sufficient resources from its cash reserves, new investor dollars, and any carve out from IFC reserves to timely pay these administrative claims. The Debtor's June 2006 report lists the Debtor's cash balance to only be $28,436.95 as of June 30, 2006. Although the Debtor hopes to secure estimated funds of $425,000 from lenders these funds will more than likely be earmarked for factoring accounts or to some limited extent used for Debtor operations.  This result is suggested by the Plan Proponents' discussion of this new investment and the use of the proceeds is on page 20 of its Disclosure Statement. The Plan Proponents have proposed a settlement with the IFCs for a release of claims in exchange for cash reserves of approximately $675,000. However, $500,000 of these reserves is earmarked for the Creditors' Litigation Fund, and the remaining $175,000 (less an amount to be negotiated for legal fees ) is to be available to the Debtor for general operations, including the payment of expenses and Claims.  The Debtor's financial projections (Exhibit G) do not reflect the timely pay down of the accrued legal fees. Disclosure Statement pages 20, 24, 27, and 30. Plan page 11.

8. Whatever operating profit the Reorganized Debtor does generate may largely be devoted to paying its professionals for pre-confirmation fees and expenses absent some bonanza from the proposed litigation because of the cash shortfalls discussed above. As such, it appears that the prime beneficiaries from the Debtor's continued operations would be its professionals and not its investor creditors. This raises issues about the "good faith" of the plan at bar.

9. In order for the Plan to be feasible the Debtor and Committee must be able to demonstrate that:

   A. The Reorganized Debtor can obtain the required cash infusions from loans and new investors within the projected timeframes;

   B That there is some reasonable likelihood of recovering sufficient funds from litigation to return some dividend to investors from the litigation;

   C. That the is some reasonable prospect for "growing" its business over time; and

   D. That the Debtor can continue to operate its business as a "bare bones" operation where its revenues have been stagnant and the Chapter 11 process has insulated it from having to service its debts and expenses on an ongoing basis.

10. The Debtor and the Committee must also be able to prove that there is reasonable prospect of returning a larger dividend to general creditors under the Plan than in liquidation. Because the Plan provides only nebulous promises that any distribution will ever be made the proponents must be able to demonstrate that:

    A. The Reorganized Debtor has some reasonable prospect of generating net proceeds from litigation in a sufficient amount to provide a dividend to these creditors;

    B. That the Debtor has reasonable prospect of generating a dividend for general unsecured creditors from operations; and

    C. The investors' prospects of getting a dividend are more than illusory.

11. The Debtor's operations were, at least partially, fraudulent prepetition. This fact creates a number of issues pertinent to the feasibility of the Plan and the prospects for recovering significant sums from the anticipated litigation. Examples of these issues include:

    A. The investors in the various IFCs and not the Reorganized Debtor may own some of the "best claims" against the potential targets of litigation, *e.g.*, the "securities fraud" claims are likely "Investor" claims and not "Debtor" claims;

    B. Investors may be entitled to assert that the Reorganized Debtor's claims should be subordinated to the investors' claims thereby making the "pot" from the proposed litigation smaller or even non-existent. Although the settlement with the IFCs' indicates that the IFCs and the Debtor will seek to get an assignment of the investor claims there is no assurance that these assignments can be obtained and that the remaining "non-assigning" investors will not be inclined to bring and be capable of bringing such peremptory litigation; and

    C. The Reorganized Debtor and IFCs may be susceptible to "*in para delicto*" defenses even with some investor plaintiffs.

12. The scope of releases and exculpations contained within the Plan is overly broad and contrary to public policy. There are no reasons for creditors to release the Debtor's or Committee's professionals or the Committee through the Plan.

13. It is clear that some of the Debtor's prepetition business activities were contrary to applicable law. It is not clear that the Plan has been proposed in "good faith," or that any alternative plan can be proposed in "good faith" where the effect of the plan may be to perpetuate a fraudulent enterprise. The Plan proposes to continue the Debtor's small factoring business, much of whose prepetition operations appear to have been fraudulent, and where, according to Mr. Davis Karst's deposition testimony, at least some persons still with the Company had knowledge of the fraudulent nature of some of these activities.

14. Many of the investors in this case are unsophisticated creditors. Few of these creditors could reasonably bear the risks of associated with the Debtor's risky business even if it had been run properly and honestly. Few of these investors should have been involved with a factoring business which is inherently a very risky business. Many of the investors are also elderly. Even if the proposed Plan is "feasible," the prospects for paying the investors any significant dividend or for them obtaining any payments of any kind within a reasonable time are speculative at best. The stock issued under the plan is illiquid and likely worthless because there is no market for it. The dividend stream, if there is one at all, may be paid in the distant future. It is not clear that the duped investors will derive any economic benefit from the confirmation of the Proponents' proposed plan of reorganization. Based upon a present value analysis, utilizing a discount rate which reflects the high risks inherent in the Plan, the Proposed Plan may not be as favorable to the hypothetical creditor as a liquidation.

WHEREFORE the United States Trustee prays this Court deny the confirmation of the Joint Proposed Plan of Reorganization at bar and grant him such other and further relief as may seem just and proper under the circumstances.

Dated this 28th day of July, 2006.

Respectfully submitted,
CHARLES F. MCVAY
UNITED STATES TRUSTEE

By: *Leo M. Weiss*
Leo M. Weiss, #15294
999 18th Street, Suite 1551
Denver, CO 80202
Voice: (303) 312-7244
Fax: (303) 312-7259
Leo.M.Weiss@usdoj.gov

## CERTIFICATE OF SERVICE

       I hereby certify that a copy of the attached **UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION** was mailed, postage prepaid and faxed where a fax number is provided below the address, this 28th day of July, 2006, to the following:

Blue Bear Funding, LLC
541 E. Garden Dr., Unit R
Windsor, CO 80550

Douglas W. Jessop
303 E. 17th Ave., Ste. 930
Denver, CO 80203

Megan M. Handley
303 E. 17th Ave., Ste. 930
Denver, CO 80203

Risa Lynn Wolf-Smith
555 17th St., Ste. 3200
Denver, CO 80201

Barry Wilkie
1625 Broadway, 16th Flr.
Denver, CO 80202-4727

                                                         **/s/Beverly Smith**