IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

-------------------------------x
In Re.                         :
                               :  Case No. 05-31300 ABC
BLUE BEAR FUNDING, LLC         :  (Chapter 11)
                               :
             Debtor.           :
                               :
-------------------------------x

                              Courtroom C

                              U.S. Bankruptcy Court
                              721 - 19th Street
                              Denver, CO  80202

                              August 4, 2006

        BEFORE THE HONORABLE A. BRUCE CAMPBELL, JUDGE


APPEARANCES:

    U.S. Trustee                   Leo M. Weiss
    Blue Bear Funding              Douglas W. Jessop and
                                     Alice A. White

    Unsecured Creditors' Committee Risa Lynn Wolf-Smith
    Unofficial Committee of        John Young
       Independent Factoring Companies
    David Karst & Nationwide       Declan J. O'Donnell
       Cash Flow Specialists
    Sierra Factoring, LLC          Barry L. Wilkie

Proceedings recorded by electronic sound recording,
Transcript requested by:  Jessop & Company, P.C.
Transcript provided by: Western Deposition & Transcription, LLC
Cost of Transcript:  $493.40

I N D E X

WITNESSES                                                           PAGE

JOHN DAVIS
     Recross-Examination Mr. Weiss ........................11
     Cross-Examination by Mr. Jessop ......................36
     Direct Examination by Mr. Jessop ....................39
     Re-Examination by Mr. Weiss .........................50
     Direct Examination by Mr. Young .....................58
     Redirect Examination by Mr. Weiss................... 60

JOHN MILLER
     Recross-Examination by Mr. Weiss ....................62
     Examination by Ms. Wolf-Smith .......................71

VIRGINIA BRINKMAN
     Direct Examination by Mr. Weiss .....................74
     Cross-Examination by Mr. Jessop .....................77

Closing Argument by Mr. Jessop........................... 93
Closing Argument by Ms. Wolf-Smith.......................109
Closing Argument by Mr. Young............................115
Closing Argument by Mr. Weiss............................117
Court's Ruling...........................................132


         EXHIBITS                Marked          Admitted

             6-11.................... -- ............. 14
             17.....................42.............43
             18.....................45..............95

```
 1                  DENVER, COLORADO; FRIDAY, AUGUST 4, 2006

 2                                 -o0o-

 3

 4            THE COURT:  Good morning.  We are reconvened in the

 5   Chapter 11 proceedings of Blue Bear Funding, LLC on docket number

 6   05-31300.  And we are continuing with the evidentiary hearings on

 7   the proposed plan of reorganization jointly sponsored by the

 8   Debtor and Creditor's Committee.  Objections to that, United

 9   States Trustee's motion to appoint a trustee or convert Chapter

10   11 trustee or convert the Chapter 7 and a motion by the debtor

11   seeking approval of a compromise with sundry parties and

12   interest.

13            I think for the record, we -- let's get -- we have an

14   additional appearance.  Mr. Young, you do want to get your name

15   on the roster or in the record?

16            MR. YOUNG:  Yes, Your Honor.  Good morning.  John Young

17   on behalf of the unofficial committee of Independent Factoring

18   Companies.

19            THE COURT:  Thank you.  And are there any other

20   appearances this morning, other than we have Mr. Weiss back, the

21   U.S. Trustee and Mr. Jessop and Ms. White for the debtor and

22   Ms. Wolf-Smith for the Creditor's Committee.  I think some

23   counsel have been excused.  I think that covers who is present

24   and participating this morning.

25            We -- where we left off last evening was we had the --
```

1   one of the co-chairs of the Creditor's Committee on the witness

2   stand and, bear with me, Mr. John H. Miller, and we had concluded

3   with redirect and ran out of time last night.  And Mr. Miller had

4   a commitment this morning, but was ordered to return late morning

5   and I believe, and correct me if I'm wrong, that Mr. Weiss, you

6   have a little recross remaining and I think that's what remains

7   with Mr. Miller.

8              MR. WEISS:  Yes and no, Your Honor.  Mr. Miller is

9   likely to be called by Mr. Jessop this morning, as well.  He and

10  I have had some discussions that pertain to both Mr. Miller and

11  Mr. Davis.  Mr. Jessop wants to put on two witnesses this

12  morning, Mr. Davis and Mr. Miller, with respect to the IFC

13  settlement --

14             THE COURT:  And just --

15             MR. WEISS:  -- as distinct --

16             THE COURT:  -- while -- excuse the interruption, but

17  it's probably a good point to interject this.  As my

18  understanding is what we -- where we have, in addition to your,

19  if you choose, a recross of Mr. Miller on this visit to the

20  witness stand and there may be others.  What we have remaining is

21  the proponent's remaining witnesses, either in support of the

22  plan or in support of the settlement, and we may also have

23  witnesses from U.S. Trustee in opposition to the plan and

24  settlement and in support of the trustee's -- of the motion for

25  trustee and conversion.

1        MR. WEISS:  I think that's correct, Your Honor, but --

2        THE COURT:  And they may be overlapping, I understand.

3        MR. WEISS:  Yeah.  And I think the Court is going to

4    find that just about everything overlaps.  There is a messy

5    little procedural issue that arises out of this whole thing and

6    that is, it seems kind of weird and inefficient to call Mr. Davis

7    twice.  So, Mr. Jessop and I have sort of agreed.  We're going to

8    try and mesh both his direct examination, vis-à-vis the ISE

9    settlement, and my direct examination, vis-à-vis the confirmation

10   issue, and similarly the cross-examination --

11       THE COURT:  Well, that's fine.

12       MR. WEISS:  -- et cetera.

13       THE COURT:  I mean whatever counsel has agreed to is

14   fine.  It's also fine if the witness gets called two or three

15   times.  We've got three different matters before the Court and I

16   am fine whichever way we proceed on that.

17       MR. JESSOP:  I was going to try and save time so we'd

18   just get Mr. Davis up and get it over with.

19       THE COURT:  Well, however.  If counsel has agreed,

20   that's fine.  If -- to the extent you're in agreement --

21       MR. JESSOP:  I mean don't --

22       THE COURT:  -- your cross-examination can go beyond the

23   direct.  To the extent anybody objects to that, that's fine, too,

24   and I think we're going to have plenty of time.  We've got the

25   rest of the day.  I have nothing else on the docket.  I may try

1    to rule at the end of the day and I may have a long lunch hour so

2    that I can read and peruse exhibits, et cetera.  That may not

3    happen.  We may end up with a ruling on Monday.  We're going to

4    get a ruling soon in this matter -- on these matters, but it

5    sounded -- and that -- as if we won't have difficulty getting the

6    evidence in this morning or early this afternoon, but we'll just

7    see how that plays out.

8            Worse case is that we -- there's more evidence to come

9    after today.  I don't think we're going to have that.  The reason

10   that's a worst case is, one, there's a lot of people, a lot at

11   stake who need some answers.  But, two, there isn't available on

12   the docket for weeks to get you a block of time, so we --

13           MR. JESSOP:  Well, we'd like to do this expedited

14   procedure.  I think we do understand.  I think we both understand

15   that we're not allowed to go and try and redo testimony -- prior

16   testimony --

17           THE COURT:  Well --

18           MR. JESSOP:  -- or prior issues, so --

19           THE COURT:  That's fine.  And it serves everybody to

20   move expeditiously.

21           MR. WEISS:  And I think that's great, Your Honor.  The

22   other little minor procedural issue, just for the record, is

23   because Mr. Davis is a principal of the debtor, I think that he

24   is an adverse witness --

25           THE COURT:  Oh, I think there's no --

1          MR. WEISS:  -- and therefore --

2          THE COURT:  -- question about that.

3          MR. WEISS:  Yeah, and therefore --

4          THE COURT:  And you'd feel free to --

5          MR. WEISS:  -- I will --

6          THE COURT:  -- treat him as an adverse witness.

7          MR. WEISS:  I will be asking leading questions and I

8    just needed --

9          THE COURT:  It would.

10         MR. WEISS:  -- to make the record --

11         THE COURT:  It will speed things up.

12         MR. JESSOP:  One -- could I have one more kind of

13   housekeeping matter --

14         THE COURT:  Sure.

15         MR. JESSOP:  -- Your Honor?  You probably saw the look

16   on my face when I was surprised to learn that we were closer down

17   than I thought we were, that Ms. Wolf-Smith and I were going to

18   be regarded as a single plaintiff, if you will, or single movant.

19   We are two separate parties and we opened with two separate

20   opening arguments.  I was trying to understand.  Will we both

21   have closing arguments or will there only be one closing argument

22   expected from a side?

23         THE COURT:  Oh, I'll do it.

24         MS. WOLF-SMITH:  Your Honor, if I could speak to that?

25   I mean, we have not prepared this case together.  The committee

```
 1   comes at this at a very -- from a different -- very different
 2   perspective.
 3           THE COURT:  That's fine and we're not -- and nobody is
 4   getting cut off on this.  I mean, I don't want to see two directs
 5   of the same witness.
 6           MS. WOLF-SMITH:  Yeah.
 7           THE COURT:  We'll allow as much time as we have left as
 8   is needed for closings and you can split it amongst yourselves.
 9   I have no difficulty with that, but I object to -- at least I
10   don't have to object.  I generally will not let co-counsel
11   double-team on the same direct or cross of the same witness.
12   That's not (inaudible) any of you.
13           MS. WOLF-SMITH:  I don't know.  I just have to
14   (inaudible) --
15           THE COURT:  But -- and that's all we've done and I
16   understand that the interest of the debtor in possession and the
17   interest of the Creditor's Committee are very much not the same,
18   even though that they've come together as co-proponents on the
19   plan and we'll hear from the perspective of each.
20           MR. JESSOP:  And we thought today we'd make it
21   interesting since it was one against three yesterday, we got
22   three against one --
23           THE COURT:  Well, there you go.
24           MR. JESSOP:  Thank you, Your Honor.
25           THE COURT:  There is one other thing that -- at least
```

1    one other thing.  I've got -- I had a chance to look at the

2    Sierra stipulation with the Creditor's Committee and the debtor,

3    which will result in the withdrawal of the objection of Sierra to

4    the plan, conditioned on the stipulation to modification of the

5    plan as stated in the stipulations approved by the Court.  I have

6    signed that order.

7            MR. JESSOP:  Thank you, Your Honor.

8            THE COURT:  The -- has the stipulation itself been

9    filed?  And it's no big deal if it hasn't.  I've got what looks

10   like the original and we'll --

11           MR. JESSOP:  I think you have the original because it

12   had --

13           THE COURT:  Well, plus that you'll -- we'll file --

14           MR. JESSOP:  -- in --

15           THE COURT:  -- the original and the order on it --

16           MR. JESSOP:  Thank you.

17           THE COURT:  -- later this morning.

18           MR. JESSOP:  Thank you, Your Honor.

19           THE COURT:  Kelly, that needs to get back under our --

20   two things, an order and a stipulation.

21           And I think that gets us ready to start back with the

22   evidence.  I have a handful of questions that I'll have for

23   counsel between evidence and argument, one of which I raised, and

24   I hope I'll get an answer to when you address the question of

25   voting approvals.  And I mentioned that yesterday and that's -- I

```
 1   at least on -- at one level, have a little difficulty reconciling

 2   Exhibits 15 and 16, but you will need to address that and I'll

 3   give you a few other things to address before we're done.

 4              MR. JESSOP:  And we can address that really quickly, if

 5   you'd like right now.

 6              THE COURT:  It's up to you.

 7              MR. JESSOP:  Well, the short answer is that there is a

 8   record date that was set by order of June 23rd.

 9              THE COURT:  Right.

10              MR. JESSOP:  And these -- and there was no assignments

11   until some time after July 13th.  There's no solicitation of

12   assignments and the earliest any assignments could have come in

13   as opposed --

14              THE COURT:  Fine.  And maybe that was one of the things

15   I thought there might be an answer to this and, apparently,

16   that's it.

17              MR. JESSOP:  Well, your answer -- Your Honor, I had my

18   heart attack first and then --

19              MS. WOLF-SMITH:  Yeah.

20              MR. JESSOP:  -- I got an answer.

21              THE COURT:  But since it was some recreational --

22              MR. JESSOP:  Your Honor, I think --

23              THE COURT:  -- value to the Court in this that --

24              UNIDENTIFIED SPEAKER:  I think the testimony this

25   morning may clarify some of the issues with respect to 15 and 16
```

1   as --

2          THE COURT:  Very good.  I mean that's a good -- let's

3   just proceed and hear the evidence and then we'll wrap up with

4   the argument before the day is out if --

5          UNIDENTIFIED SPEAKER:  Okay.

6          THE COURT:  -- things go as anticipated.

7          MR. WEISS:  United States Trustee would call Mr. John

8   Davis to the stand.

9          THE COURT:  Mr. Davis, step forward.  We'll swear you

10  again.  This is another go-round.

11         THE CLERK:  Do you solemnly swear that the testimony

12  you are about to give in this proceeding shall be the truth, the

13  whole, and nothing but the truth under penalty of perjury?

14         THE WITNESS:  I do.

15         THE COURT:  Mr. Davis, please resume the witness stand.

16

17                    JOHN DAVIS,

18  a witness, called by the U.S. Trustee, was examined and testified

19  as follows:

20                    RECROSS-EXAMINATION

21  BY MR. WEISS:

22      Q    Good morning, Mr. Davis.

23      A    Good morning.

24      Q    Do you have the exhibits in front of you this morning?

25      A    I do.

```
 1      Q     Okay.  Have you turn in the exhibit notebook to
 2  Exhibit 6.
 3      A     (Pause.)  All right.
 4      Q     Can you identify that document?
 5      A     It says Complaint for a Declaratory Judgment and
 6  Temporary and Permanent Restraining Order.
 7      Q     I'll have you look at Exhibit 7.  Can you identify that
 8  document?
 9      A     (Pause.)  Okay.  And it says Silver Mountain Financial,
10  LLC Planet versus Blue Bear Funding, LLC with a Star Rider (ph)
11  Energy, LLC, defendants.
12      Q     Exhibit 8?
13      A     It is a proof of claim.
14      Q     By whom?
15      A     By Sierra.
16      Q     Exhibit 9.  Can you identify that document?
17      A     (Pause.)  It's a claim by Silver Mountain.
18      Q     Exhibit 10?
19      A     (Pause.)  A claim by Silver Mountain.
20      Q     And Exhibit 11?
21      A     A claim by Silver Mountain.
22      Q     Are you familiar with the litigation, which Exhibit 6
23  involves --
24      A     To a certain extent.
25      Q     -- as complainant?
```

1     A     Yes.

2     Q     Are you familiar with the projections that are attached

3   as an exhibit to the joint plan reorganization in this case?

4     A     Yes, I am.

5     Q     Okay.  If you look at the January 2007 projections --

6     A     Yes.

7     Q     -- it reflects a $1.1 million cash inflow.

8     A     I believe that to be correct.

9     Q     Who is that $1.1 million anticipated to come from?

10     A     From Star Rider.

11     Q     Is the litigation referred to Exhibit 6, 7, 8, 9, 10,

12   and 11 -- all of those documents pertinent to claims by Silver

13   Mountain with respect to Star Rider receivable?

14     A     (Pause.)  I'm not sure about Exhibit 8, Mr. Weiss.

15     Q     Well, 6 and 7?

16     A     6 and 7, I am; 9 --

17     Q     What's your understanding of what Silver Mountain is

18   claiming with respect to the Star Rider receivable?

19     A     I believe they claim ownership of the Star Rider

20   receivable.

21     Q     Do you know what stage litigation is in over that

22   receivable?

23     A     Do I know what stage the litigation is in?

24     Q     Yes.

25     A     No, I'm not sure I do.

```
 1       Q    Do you know whether it's anywhere close to being

 2   resolved?

 3       A    No, sir, I do not.

 4       Q    Fair to say that it's unlikely the $1.1 million will

 5   come in without some settlement or other resolution as litigation

 6   is -- that is represented by Exhibits 6 and 7?

 7       A    I believe that is fair to say.

 8            MR. WEISS:  Your Honor, I'd ask for the admissions of

 9   Exhibit 6, 7, 8, 9, 10, and 11.

10            THE COURT:  Well, if there aren't any objections, let's

11   take them one at a time.  All right.  Any objections to 6 through

12   11?

13            MR. JESSOP:  No, Your Honor.

14            THE COURT:  Mr. Young?

15            MR. YOUNG:  No, Your Honor.

16   BY MR. WEISS:

17       Q    Mr. Davis, so it's unrealistic --

18            THE COURT:  6 --

19            MR. WEISS:  Excuse me, Your Honor.

20            THE COURT:  -- 7, 8, 9, 10, and 11 will be admitted.

21   Thank you.

22   BY MR. WEISS:

23       Q    Mr. Davis, it's unrealistic that the $1.1 million

24   that's in your projections for the company's projection for 2007

25   -- January of 2007 will actually come in in January of 2007?
```

1       A    I don't believe it's unrealistic.  We -- we had

2  conversations with our attorneys with regard to timing and

3  practicality when it might occur and based upon that and what we

4  believed we knew, we decided that January was a reasonable target

5  date for settlement and we believed we would prevail.

6       Q    You believe you can have litigation concluded by

7  January?

8       A    Yes, I do.

9       Q    And that's based on your conversation with counsel?

10      A    In part, yes.

11      Q    What happens if the $1.1 million doesn't come in in

12  January?

13      A    Then I think as a -- as has been testified earlier,

14  that would have a very severe and very substantial impact upon

15  the financial health of Blue Bear Funding.

16      Q    Would that cause the debtor to need to raise another

17  million-one or thereabouts in order to continue operations?

18      A    That possibility certainly exists.

19      Q    Mr. Davis, you heard Mr. O'Donnell's questions of

20  Mr. Miller yesterday about criminal investigations?

21      A    Yes.

22      Q    Do you remember that --

23      A    Uh-huh.

24      Q    -- line of questioning?

25      A    The general line, yes, sir.

1      Q    Are you familiar with any inquiries by any state,

2 local, or federal law enforcement?

3      A    Yes.

4      Q    From what agencies?

5      A    Federal Bureau of Investigation.

6      Q    Do you have any idea what they investigating?

7      A    I was served with a subpoena in which they asked for

8 all records, documents, telephone records and conversations of

9 Blue Bear.  I spoke with the agent.  I think it's a Mr. Fall (ph)

10 or Paul (ph); now I forget which, Mr. Ted Fall.  Mr. Fall

11 indicated that they were looking into several matters.

12      Q    Did this agent, whatever his name may be, tell you who

13 the targets of the FBI investigation were?

14      A    He did not discuss them with me, no.

15      Q    Did he tell you what types of claims might be brought

16 in a criminal complaint?

17      A    He did not.

18      Q    Is it fair to assume that a criminal prosecution may

19 occur of individuals being investigated?

20      A    I'm really not in a position to -- to judge that.  I'm

21 not very familiar with criminal law.  I suppose it would be fair

22 to say, yeah.

23      Q    Do you have any idea what the impact of criminal

24 prosecution would be on Blue Bear's litigation?

25      A    No, not really.

1      Q     Do you have any idea what impact it would have on Blue

2  Bear's operations?

3      A     I believe the impact -- and I've considered that.  I

4  believe the impact upon Blue Bear's operation would be minimal

5  because I think they would separate the issues of the company

6  versus individuals.

7      Q     Are you aware of the fact that if a federal criminal

8  complaint is brought and the defendant was either convicted or

9  enters a plea of guilty, that that creates a lien on all property

10  of the criminal defendant wherever it may be found?

11          MR. JESSOP:  Objection, Your Honor.  I think we're

12  hearing his testimony at this point as a new objection of a fact.

13  And it also calls for a legal conclusion, Your Honor.

14          MR. WEISS:  I'm simply asking whether he's familiar.

15  If he isn't familiar, he can say he isn't familiar.

16          THE COURT:  You can answer that yes or no.  Overruled.

17          THE WITNESS:  Yes.

18  BY MR. WEISS:

19      Q     What impact would a lien on all of the assets of any

20  defendant have on the ability to collect from them?

21      A     Not knowing the particular assets of any individual, I

22  would not be able to assess the impact.  I am not familiar with

23  any assets of any individuals, other than my own; in which case

24  the impact would be severe.

25      Q     By way of example only, if Mr. Karst, for instance, was

```
 1   a criminal defendant was convicted or enter a plea bargain and

 2   there was a lien on all of his assets, do you believe you could

 3   collect anything from Mr. Karst?

 4          MR. JESSOP:  I think we're now -- objection, Your

 5   Honor.  We're now asking hypotheticals about evidence that's no

 6   -- there's no foundation for at this point.

 7          THE COURT:  Sustained.

 8   BY MR. WEISS:

 9      Q    Do you think that impacts the ability of the debtor to

10   recover on its proposed litigation under the plan?

11      A    I be -- I believe it could have some impact, yes.

12      Q    I'll have you look at Debtor's Exhibit 16.

13      A    (Pause.)  I -- I have it.

14      Q    Are you familiar with that document?

15      A    I am.  You're referring to assignment of litigation

16   claims?

17      Q    Yes.  Were you present at the meeting that Mr. Miller

18   testified to yesterday?

19      A    I was.

20      Q    Can you describe what happened at that meeting?

21      A    Well, Mr. Miller, I believe, testified to the position

22   point of view, decision-making process of the Unsecured

23   Creditor's Committee.  I believe he spoke to the assignment of

24   litigation claims.

25      Q    How many people were present?
```

1       A       Yesterday?

2       Q       No, at the meeting.

3       A       By who?

4       Q       At the meeting, which Exhibit 16 or documents like

5   Exhibit 16 were handed out in.

6       A       I beg your pardon.  I thought you were referring to a

7   conversation and testimony yesterday --

8       Q       No.

9       A       -- about Mr. Miller.

10      Q       Mr. Miller had testified there was a meeting --

11      A       Yes.

12      Q       -- that a number of individuals had gotten documents

13  like Exhibit 16.

14      A       Yes.

15      Q       Do you recollect that testimony?

16      A       I would estimate that the -- the meeting to which

17  Mr. Miller was referring might have had as many as 140 people

18  present.

19      Q       Were they handed a document that looks like

20  Exhibit 16 --

21      A       I --

22      Q       -- to the best of your knowledge?

23      A       I have no knowledge.  I did not hand out the documents.

24      Q       And you don't know whether that document was handed

25  out?

1      A    Well, to the best of my knowledge, the document was

2    handed out, yes.  The rest --

3      Q    Who did presentations to the investors that attended

4    that meeting?

5      A    I made a -- well, I certainly -- I spoke at the

6    meeting, Mr. Miller spoke at the meeting.  Mr. Jessop spoke at

7    the meeting, I believe.  Ms. Wolf -- no?  No, Mr. Jessop was not

8    present.  I beg your pardon.

9            THE COURT:  Counsel, I don't want you -- I'm not

10   looking at counsel table, but if this witness is reacting to your

11   coaching, it's going to stop.

12           MR. JESSOP:  Sorry, Your Honor.

13           THE WITNESS:  I'm going to start all over again,

14   Mr. Weiss.

15           Mr. Jessop was not present.  Ms. Rice -- Ms. White was

16   present.  Ms. Wolf-Smith, Mr. Miller, and myself.

17   BY MR. WEISS:

18     Q    Okay.  By Ms. White you mean Ms. Alice White?

19     A    Yes.

20     Q    Okay.  From Mr. Jessop (inaudible).

21     A    Yes.

22     Q    Had you suggest that the investors execute the

23   documents that looked like Exhibit 16?

24     A    Not at the meeting.

25     Q    Did you suggest after the meeting?

1    A    No.

2    Q    Did you suggest before the meeting?

3    A    I had investors come to see me in my office who had

4    brought this form with them.  They asked my advice; I gave it to

5    them.

6    Q    Did anybody indicate at the meeting that this form

7    ought to be filled out by the investors in attendance?

8    A    Not to my knowledge.  There was an explanation of the

9    form, a discussion with regard to the form, but I don't remember

10    -- remember any specific advocacy for the form.

11    Q    Did people turn in that form completed at the meeting?

12    A    Not to my knowledge.

13    Q    I'll have you read that document.

14    A    Uh-huh.

15    Q    Does it advise the investors to seek independent legal

16    counsel?

17    A    Allow me to look.  (Pause.)  I do not believe it does.

18    Q    If an investor checked the block -- first block that

19    would assign their claims, is that your understanding?

20    A    That is my understanding.

21    Q    In looking at the document, does it appear to have a

22    different type face than the rest of the document?

23    A    Well, pretty bad eyes, Mr. Weiss, and not to me.

24    Q    Is it boldfaced?

25    A    No.

1    Q    It italicized?

2    A    No.

3    Q    Is it in any manner highlighted?

4    A    No, not to my way of thinking.

5    Q    Did you perceive a the meeting that there was any

6    pressure from anybody to execute this form?

7    A    I'm sorry?  To execute the form?

8    Q    Yes.

9    A    No, I did not.

10   Q    Mr. Davis, did you participate in the negotiation of

11   what's been referred to as the IFC settlement?

12   A    I did.

13   Q    In negotiating that settlement, did you take into

14   account the claims that investors might have against the money

15   that Blue Bear was trying to get through that settlement?

16   A    I did consider it and I certainly listened to rather

17   extensive conversations with regard to that subject, yes.

18   Q    Were you aware at the time that those settlements were

19   going forward that investors were claiming that they may have

20   been defrauded?

21        MR. JESSOP:  Objection, Your Honor.  I think the

22   procedure we outlined was that there would be a direct.  I would

23   cross, then direct on the IFC settlement and then --

24        MR. WEISS:  I can defer it, Your Honor.

25        MR. JESSOP:  -- because I think it's going to bring it

1   in very awkwardly.

2           MR. WEISS:  That's fine.

3           THE COURT:  Let's -- you may get recalled a third time,

4   which is perfectly all right.

5           MR. JESSOP:  Well --

6           THE WITNESS:  Not a problem.

7   BY MR. WEISS:

8       Q    Mr. Davis, you testified before that the cash flows for

9   Blue Bear were irregular, I believe you used the word sporadic.

10  By that you mean there were lots of peaks and valleys in both the

11  revenues and the expenses?

12      A    Yes.  More so, Mr. Weiss, in the area of revenues.

13      Q    What's the cause of those?

14      A    I think part of the cause is the nature of the

15  business.  Some clients have a type of business in which they are

16  invoicing their clients on a weekly bi-monthly basis.  Therefore,

17  it is reasonable to expect that once you begin the factoring of

18  those clients and you are in the cycle, you will receive a very

19  normalized cash flow, perhaps in 50, 60, 75 days and it

20  maintains, pretty much, of a routine area.  I point to, as an

21  example, working with temporary staffing agencies who are

22  providing nurses to hospitals.  So, part of it is a -- a fairly

23  normalized -- you know, these predictable cash flow.

24          When you're involved in other areas, such as

25  construction wherein you are funding a subcontractor who is

1    performing work for a general contractor, the interruption in

2    payment can come from several sources, so I will use -- I will

3    illustrate.  You are doing subcontracting work for Tramel Crow

4    (ph).  Tramel Crow is a general contractor for Westminster, the

5    City of Westminster.  As the subcontractor, you perform specific

6    work, i.e. the pouring of concrete foundations for bridges.  You

7    submit your completed work detail to the general contractor.  The

8    general contractor will review your completed work detail and may

9    or may not require additional work to be performed or other

10   areas.  Hence, the delay.  And that is unpredictable, Mr. Weiss.

11          Then the general contractor presents his completed

12   work, including that of the subcontractor, to the city.  Now, the

13   city will review the site and may require additional, proof, to

14   be done.  So the delay becomes one of bureaucracy and could take

15   and has taken anywhere from 90 days to six months, yet the

16   validity of the invoice, the value of the deal has never been

17   that which is being questioned and it does effect timing.

18       Q    Taking your example of a concrete pourer --

19       A    Uh-huh.

20       Q    -- for a bridge, do those contracts, when they come in,

21   have the similar dollar amount?

22       A    I'm sorry?  Do they have what?

23       Q    Is each contract for a bridge have a similar dollar

24   amount?

25       A    No, no, and the price of concrete varies.  So, the --

1    the contracts are never the same.

2         Q    Do those contracts come up at a regular interval?

3         A    In northern Colorado they seem to have been coming up

4    at -- at fairly regular intervals.  I -- you know, I come from

5    that business and so you are able to go to a -- a published bid

6    solicitation list and you can determine, if that is the nature of

7    your work, what is projected to be done, let's say by the City of

8    Denver, up to nine months out.  Even though bids have not been

9    let, you're able to see that they're coming and plan accordingly.

10         Q    But if your Blue Bear's customer, can you count on

11    having a contract at a regular interval?

12         A    Well, I -- Blue Bear's customer having a contract with

13    their client?

14         Q    Yes.

15         A    I was talking specifically about construction and

16    concrete.

17         Q    Right.  Well, and we're still doing that.

18         A    Yes, and --

19         Q    Does the guy who pours those bridges --

20         A    Oh, yes, he -- they -- he -- he can --

21         Q    -- have a contract -- some degree of --

22         A    Of regularity --

23         Q    -- insurance --

24         A    -- to his contracts?

25         Q    -- that he's going to get a contract with the City of

1    Westminster every three months?

2        A    No, but he has some degree that he's going to get a

3    contract with some municipality every three months.

4        Q    And varying them out --

5        A    Varying them out so --

6        Q    -- with varying delays --

7        A    -- for various lengths --

8        Q    -- in paying them.

9        A    -- various lengths of time.  Correct and varying dollar

10   amounts, which are entirely predicated on what is the current

11   market price of the concrete at the time --

12       Q    Okay.

13       A    -- which is very volatile.

14       Q    It's critical that a factor match the demands of such a

15   customer as a concrete pourer --

16       A    In what?

17       Q    -- when they need the money?

18       A    Is it critical to whom?

19       Q    Is it critical to your customer to have the money in a

20   particular timing from the factor?

21       A    It -- it may well be for a specific job, but not for

22   all jobs.

23       Q    What do you think would happen if that concrete pourer

24   came to you with a big account receivable to factor and Blue Bear

25   didn't have the cash to buy that receivable?

1      A      It would put that -- a current client?

2      Q      Yes.

3      A      It would put that current client at a -- at a severe

4    disadvantage.

5      Q      Do you think you'd lose that client?

6      A      I think the possible -- the very real possibility

7    exists that you would lose that client, yes.

8      Q      So your ability to borrow the cash necessary to buy

9    that receivable is critical?

10      A      Absolutely.

11      Q      And you don't necessarily know very far in advance how

12    much cash you're going to need because you don't know how big the

13    receivable is going to be; is that true?

14      A      In part.  I think that -- that with an existing client

15    base that you have with history, you have a -- a reasonableness

16    as to the forecasting their needs.  However, at any -- at any one

17    moment they might take on a very large job and, therefore, there

18    would be a blip in their cash requirements and that has occurred.

19      Q      So, that it might be necessary for Blue Bear to have to

20    raise a lot of cash very quickly?

21      A      It might if Blue Bear chose to take the deal.  One of

22    Blue Bear's responsibilities is not only to provide service to

23    their client, but in the event that they are unable to offer a

24    service because Blue Bear either cannot or chooses not to, we, on

25    many occasions, have offered alternative sources of capital,

1   financing to our clients and have directed them to other sources.

2       Q    Does that create revenue for Blue Bear?

3       A    It does not, but it creates goodwill and in the buying

4   and selling of any company in which I have been involved over 35

5   years, goodwill was a portion of our consideration with regard to

6   the value of the company.

7       Q    At some loss to economic opportunity that the debtor

8   couldn't take advantage of?

9       A    No, sir.  I, first of all, don't -- do not subscribe to

10  the theory of lost economic opportunities other than to say that

11  if every -- every potential factoring deal in Colorado didn't go

12  to Blue Bear, you could then call it lost opportunity.  What you

13  do is you seek and choose those opportunities, which provide the

14  greatest value to your clients and provide the greatest return to

15  your investors and you do not ever attempt to take them all on.

16      Q    If you have an existing customer with that big

17  receivable you just can't fund --

18      A    Uh-huh.

19      Q    -- and you send them someplace else, has Blue Bear,

20  matter of fact, lost the profit it could have had off of that

21  deal?

22      A    Yeah, had the money been available, yes, but by the

23  same token, Mr. Weiss, I may -- let -- let's say for the sake of

24  our discussion that they ask us for $100,000.  We'll further say

25  for the sake of discussion that it would take about 90 days.  I

1    have opportunities to place four $25,000, the same $100,000, turn

2    them in 60, and create six times the opportunity for success and

3    for profitability.  So, you weigh --

4        Q    But --

5        A    -- the combination of your turn on your accounts

6    receivable versus your return of capital.

7        Q    But if you had 200,000 available, you could do both

8    deals?

9        A    If I had a million dollars available, I could do even

10   better.

11       Q    Turn down too many deals for a customer, isn't there an

12   inclination of the customer to go someplace else?

13       A    Absolutely, absolutely.

14       Q    So, you'd lose goodwill by referring too many times.

15       A    No.  You will never lose -- lose goodwill, in my

16   opinion, Mr. Weiss, by referring your client to others.  By -- by

17   showing your -- your client you have a sincere interest in their

18   business and their problems, and working with them as a partner

19   to solve their problems, and I can point to it specifically at

20   Blue Bear where we do have clients where we were not able to fund

21   for a variety of reasons who, in turn, got financing elsewhere

22   and came back to Blue Bear the next time they needed money and

23   were grateful.

24       Q    Do they get --

25       A    We run an honest business, Mr. Weiss, and we're very

1    interested in seeing that the people are successful.

2         Q    Do they get funding from other factors?

3         A    In this particular case, they got funding from a bank

4    because I called then bank, explained how well I knew the man,

5    indicated the type of business he was in.  I -- I happen to know

6    at that time some people working at IBM were using it, so I was

7    able to make a connection, make a referral.  They took care of

8    him on a short-term basis.  He was appreciative.  As his business

9    began to grow, he came back.

10        Q    He was bankable then?

11        A    He was bankable for one specific instance because we

12   were able to give references and referrals.  And I stood on

13   written testimony that the man was equitable, honorable,

14   legitimate, and honest.  And on that basis and others, they gave

15   him the loan.  He's a good man.

16        Q    What if the customer wasn't bankable?

17        A    Pardon me?  If he was not bankable?

18        Q    Yes.

19        A    Well, then I think I would probably talk to other

20   sources we've developed.  I might -- I might, if I thought he was

21   eligible, I might, for example, take him to Hane (ph) Capital,

22   introduce him to the people at Hane Capital and, perhaps, they

23   might choose to do business with him.  There are alternatives and

24   I don't believe your responsibility to your client ends when you

25   say, I'm sorry, I can't fund you.  You're response --

```
 1        Q     Hane Capital a factor?

 2        A     Pardon me?

 3        Q     Is Hane Capital a factor?

 4        A     Yeah, they do some factoring.  They also do some

 5   venture capital work.  Now they do a lot of just straight buyout

 6   of accounts receivable.

 7        Q     Mr. Palance (ph) testified that in doing the

 8   projections he assumed that the debtor was only going to be able

 9   to borrow from individuals and not from institutions.

10        A     Correct.

11        Q     Remember that testimony?

12        A     Yes, I do.

13        Q     Do you agree with that testimony?

14        A     I do, indeed.

15        Q     Some factors have access to an institutional line of

16   credit?

17        A     Yes.

18        Q     Does that facilitate their ability to meet their cash

19   flow needs?

20        A     If they've got business, they do.  The -- the -- the

21   very fact that you have access to cash doesn't really impress me

22   unless you've got access to accounts receivable.  If you're not

23   selling it, I'm very happy you got a line of credit, but it

24   doesn't do you much good.

25        Q     Does that enable you to take those big receivables on
```

1    short notice if you have access to line of credit from an

2    institutional lender?

3         A    Yes, it would certainly expedite the process.

4         Q    So, the factors in northern Colorado who do have access

5    to lines of credit might have an advantage?

6         A    They might if they were dealing in the same market with

7    the same prospects as myself, but you're supposing that --

8    presuming that they do.  I'm not sure your presumption is

9    correct.

10        Q    What's your best guess for when Blue Bear would become

11   bankable itself?

12        A    It's a very -- it's a very interesting question, Mr.

13   Weiss, and it certainly have -- it has certainly had a lot of

14   discussion internally within my own staff and, also, I have

15   sought the advice of three other bank presidents in that area.  I

16   can't con -- you know, I'm still torn there.  I -- I -- I would

17   think that Blue Bear is a bankable entity sometime in 2009 and

18   let me explain why I believe that.  That assumes that, number

19   one, Blue Bear has emerged reorganized and any baggage that was

20   beginning to accumulate on Blue Bear's name, vis a vis being in

21   bankruptcy, is dissipating.  And the cleansing effect allows us

22   to be more attractive.

23             Now, the second issue is specifically with regard to, I

24   guess, the start-up -- your starting a business over, you're

25   building it a block at a time, you're building it the correct

1  way.  This time when I go into it -- when I came in to take it

2  over, they only banker I knew was the guy that set up my wife's

3  checking account.  I had no other connections; didn't know Mr.

4  Collins (ph); didn't know, fortunately, any attorneys.

5        Now, I have a -- a reasonable contact level in the

6  banking industry and a reasonable contact level within the

7  financial community.  We bring this thing out the day the

8  unsecured Creditor's Committee and I want to bring it out and we

9  do the right thing by the investors the way they want to do it,

10  that kind of a reputation is going to go very well, but

11  specifically when they keep referring to some guy named Tillcot

12  (ph), this might be the success story opportunity.

13        So, I think we are bankable two and a half years, but

14  I'm open to argument, but that's my belief.

15     Q    Are you familiar with the Blue Bear Web site?

16     A    Yes, a little bit, but familiar.

17     Q    You familiar with the fact that it solicits business

18  from all over the country?

19     A    Yes.

20     Q    Has that Web site had any success?

21     A    It has had -- yes, it has had success.  And it -- it

22  has created opportunity that we have not been able to take

23  advantage of given we did not have sufficient capital to,

24  perhaps, take that opportunity.  Now, we are primarily interested

25  in their Web site and are able to sort on that Web site the zip

1    code.  So, my feeling has been, and I've stated it before, that I

2    would prefer to see this business operate, let's say, within the

3    confines of the state of Colorado, the state of Wyoming, or more

4    specifically, within the confines that we would not do business

5    with people we could not see, feel, and touch.

6         Q    Well, and if somebody responds from Oshkosh you'd

7    probably send them an e-mail or a letter back saying, sorry, we

8    can't help you?

9         A    Yes, but --

10        Q    Even though --

11        A    -- that's true.

12        Q    -- the Web site has a dropdown for all 50 states?

13        A    Sure, because in the marketing of a company you never

14   presume that the company won't change its direction.  You're re -

15   - you're responsibility is to market the goods and services of

16   your firm worldwide and then have the luxury of picking and

17   choosing where you deploy those goods and resources.  To wit, ten

18   years ago would -- would any factor have considered factoring in

19   China?  No.  Should they have always been looking at their

20   opportunity?  Absolutely.  We will look at every opportunity no

21   matter where it comes.

22        Q    What other marketing has the debtor done?

23        A    We put together a small brochure and did a -- what I

24   used to call when I was in sales and marketing a target mailing.

25   Now, we went and looked at Citco's (ph) and Siceko's (ph) to

1    determine various types of business.  We looked at the Northern

2    Colorado Business Review, which periodically publishes new starts

3    in business.  We looked at the -- is it called the Denver

4    Business Journal, which also does that.  And then my previous

5    connection with the crediting collection's industry has allowed

6    me to go in and use some of their systems, some of their software

7    systems so if you run a four-digit SICCODE or S-I-C Code, you can

8    target -- let's say you wanted to target only temporary staffing,

9    nursing, and you only wanted that target to include zip codes

10   that did not extend beyond the Wyoming border or south, you can

11   do it that way.  It's RR Gonely (ph) and HR Gonely, both of them

12   I'm sure you're familiar.  So, that's been our basic.

13            However, I want to go on record as saying this.  When

14   you're involved in a bankruptcy and you spend a year in the

15   bankruptcy, as we have, and you have a limited staff, as we do,

16   we emerging, hopefully, from this bankruptcy will be able to

17   devote a considerable amount of time to the -- to the proper area

18   and that is sales and marketing.  We will get better, but we have

19   been burdened by the bankruptcy.  That's just a fact of life.

20   Q    Is Ms. Baptist (ph) quitting?

21   A    Is Ms. Baptist quitting?

22   Q    Yes.

23   A    Yes, sir.

24   Q    When is she going to stop working for the debtor?

25   A    It's a little up in the air at the moment, but

1  currently we have a -- a target date of September 15th.

2      Q    How long do you think it will take you to replace Ms.

3  Baptist?

4      A    We believe -- I think I could probably replace her

5  today.  We have two candidates that I believe -- and she's

6  interviewed them and I've interviewed them, that we believe

7  given, you know, some time and we have that time if -- we could

8  have up to four weeks, actually, of working with that individual

9  that we could bring them up to speed.  We could, also, one -- we

10 had -- we laid one person off as we were reducing expenses, who

11 was an accountant who'd been with us for better part of a year.

12 She's available.  We could bring her back and that would -- it

13 would significantly shorten the up to speed time.

14     Q    Either of these candidates have experience in the

15 factoring industry?

16     A    Well, one has experience in the factoring industry.

17 One has experience in the collection accounts receivable

18 industry.

19          MR. WEISS:  No further questions, Your Honor.

20          THE COURT:  Cross-examination?

21                    CROSS-EXAMINATION

22 BY MR. JESSOP:

23     Q    Good morning, sir.

24     A    Good morning, Mr. Jessop.

25     Q    You were asked to identify a number of proofs of claim

```
 1   in the exhibits, I guess, 8, 9, 10, and 11.

 2        A    I guess.

 3        Q    And -- now, let's save that for argument.  Never mind.

 4             You're aware that in the Silver Mountain litigation

 5   involving Star Rider how many wells are -- does Star Rider have?

 6        A    I believe they have four.

 7        Q    And how many wells are the subject of the litigation

 8   that was talked about?

 9        A    I don't recall, Mr. Jessop.  I'd have to go back and

10   look at it.

11        Q    Okay.  Was it all of them?

12        A    Yes.

13        Q    All right.  The way factoring works is like in many

14   businesses, they have fixed and variable costs; correct?

15        A    Correct.

16        Q    And what are your variable costs?

17        A    Well, one would be the cost of capital, number one.

18   That -- that is a variable cost.  A second variable cost to us

19   would be the due diligence that we would have to do and the

20   underwriting that would follow with that.  A third variable cost

21   to us are certainly attorney fees that would relate to the

22   business and the need from time to time to have that.

23        Q    The amount, and maybe I've said it wrong, but the

24   amount you have to come up with to fund a project or not is a

25   variable; correct?
```

1      A     Yes.

2      Q     And, in fact, that may be the largest variable for Blue

3   Bear; correct?

4      A     Correct, today.

5      Q     And so if you don't have funds on hand, then you don't

6   make the funding?

7      A     That's correct.

8      Q     Now, there was discussion about the litigation

9   recoveries and the -- whether or not they may or may not happen.

10   Those litigation recoveries are not in the projections; are they?

11      A     They are not.

12      Q     And the variation and cash flow for a factoring

13   business, is it fair to say that that evens out on an annual

14   basis?

15      A     Yes, I think it is very fair to say in all factoring

16   companies.

17      Q     And when you are involved in trying to look at how you

18   -- you have a forecasting process; is that correct?

19      A     We do.

20      Q     And can you tell me a little bit about that?

21      A     We meet weekly.  We being myself, Mr. Stoprin (ph), and

22   Ms. Baptist and Ms. DeMeeco (ph).  And on a weekly basis we take

23   a look at, first of all, the accounts receivable that is

24   outstanding, what has been the most current information provided,

25   vis a vis, one of contacting that individual so if that -- on

```
 1   that basis, the very first forecast we come up with is estimated
 2   collections for the week on the existing accounts receivable.
 3   Mr. Stoprin will go through a list of prospects that he has
 4   identified and he will divide those into two lists.  One list
 5   will be those prospects, which he has identified, but has not yet
 6   completed the due diligence.  And the other list will be those
 7   prospects identified where due diligence has been completed.  On
 8   that second list, he will estimate what their need requirements
 9   are and he will estimate in what weeks those requirements would
10   be needed, and that might go out several weeks at a time.
11        Q    Okay.
12        A    And the final areas we look at, operating expenses for
13   the week and determine and forecast what our specific operating
14   expenses for the next week will be.
15        Q    Thank you.
16             MR. JESSOP:  I'm going to draw a bright line and shift
17   to direct on the IFC settlement testimony.  Is that all right,
18   Mr. Weiss?
19             MR. WEISS:  Fine.
20                      DIRECT EXAMINATION
21   BY MR. JESSOP:
22        Q    Mr. Davis, in your background I think you testified
23   earlier that you had done some work in collections?
24        A    Yes.
25        Q    How many years?
```

1      A    Oh, about 11 or 12 -- well, 11 or 12 there, but as an

2  executive I was responsible to collect my own accounts receivable

3  for over 25 years.

4      Q    All right.  How many collection and lawsuits have you

5  been involved in in your past?

6      A    Well over 150.

7      Q    And how many settlements have you been involved in

8  before?

9      A    Well over 150.

10     Q    Now, are you familiar with the IFC, sir?

11     A    I am.

12     Q    And we had already testimony about the IFCs.  I'd like

13  to hand you an exhibit.

14          MR. JESSOP:  May I approach the witness and the bench?

15          THE COURT:  You may.

16  BY MR. JESSOP:

17     Q    This exhibit has been marked IFC Settlement Hearing

18  Exhibit 2.  Can you identify this document, sir?

19     A    Yes, I can.  I have seen this document.  It is a

20  factoring support services agreement between what was First

21  American Factoring, LLC; now Blue Bear Factoring -- Funding, LLC

22  and Empire Factoring, a IFC.

23     Q    And if you would flip about four pages to the fifth

24  page.

25     A    Page five?

1        Q    Well, it starts over --

2        A    Or the fifth page?

3        Q    Yes, I'm sorry.  Go about five pieces of paper in.

4        A    Implementation of Agreement?

5        Q    After that one.  It -- well, yes, yes.  And it's a new

6    one, First American with IHS Factoring.

7        A    Yes.

8        Q    Okay.  Okay.  I'm sorry.

9             MR. WEISS:  What page are you on?

10            MR. JESSOP:  If we go through this, what we're going to

11   find is a collection of factoring support services agreement for

12   each factoring company -- independent factoring company and if

13   you would just verify that, sir?

14       A    Yes, and the same for each one so far.  Yes.  Yes.

15       Q    Okay.

16            THE COURT:  Mr. Jessop, I'm going to interrupt you and

17   I apologize, but I'm, again, worried about the record.  And I

18   understand that you've marked this is as Settlement Hearings

19   Exhibit 2; right?  You got Exhibit 2's, as well, from the other

20   and I want to -- and the reason I've interrupted I think maybe I

21   better catch this early.  But can we just run these exhibits -- I

22   think you left off at 16 and I don't know if you have other

23   exhibits that are 17, 18, 19.  Well, wherever you leave off

24   because I'm trying to look at this from the perspective of

25   somebody trying make his way through a record and we will create

```
 1   chaos if we have multiple exhibits with the same number.

 2            MR. JESSOP:  I'm perfectly fine with that.  Why don't

 3   we label this one --

 4            THE COURT:  And I'm going to ask you, if you would, to

 5   approach the witness stand and mark the original exhibit with

 6   some number that is serially moves on or even if you want to skip

 7   some numbers to leave room and start at 30 or something, but

 8   whatever you want to do, but let's not have exhibits with the

 9   same number.

10            MR. JESSOP:  All right.  This is going to be Exhibit 17

11   and I'm marking -- I crossed out the 2 and I'm marking them as

12   17.

13            THE COURT:  Thank you.

14   BY MR. JESSOP:

15      Q    Now, do you recognize the signature of the First

16   American Factoring -- do you recognize the signature on these

17   various contracts?

18      A    You're referring to the initials, Mr. Jessop?

19      Q    Pardon?  I want you to look at page six of the first

20   agreement.

21      A    Okay.

22      Q    Double-sided so --

23      A    I have it.

24      Q    Do you recognize --

25      A    I --
```

1     Q     -- do you recognize that signature?

2     A     I recognize Mr. Karst's signature, yes.

3     Q     And he was a -- it was a member manager of the First

4  American Factoring, LLC?

5     A     I believe he was when I was not there at the time.

6     Q     And First American Factoring, LLC was the -- is the

7  former name of Blue Bear; correct?

8     A     I believe that is correct.

9     Q     All right.

10          MR. JESSOP:  We would move for admission of Exhibit 17.

11          MR. WEISS:  No objection, Your Honor.

12          THE COURT:  17 is admitted.

13  BY MR. JESSOP:

14     Q     Now, earlier we had testimony of how the IFCs were

15  initially funded and how Blue Bear was initially funded and there

16  was discussion of the 7.3 million of supposed assets coming in.

17  And then there was 7.3 million of liabilities; correct?

18     A     Correct.

19     Q     And those were held by whom?

20     A     By Blue Bear.

21     Q     And, also --

22     A     The IFCs.

23     Q     Right.  And would you say that the liability that the

24  IFCs held to the various investors was real?

25     A     Yes.

1      Q     As well as the -- Blue Bear's liability to the IFCs?

2      A     IFCs, yes, sir.

3      Q     Now, pursuant to these factoring support services

4   agreements, what are some of the things that Blue Bear did in

5   connection with this factoring services agreement in connection

6   with the services it provide?

7      A     Blue Bear was to provide the marketing and

8   solicitation, identification, and ultimately the collection of

9   clients who would have need of the services and funds that had

10   been provided by the IFCs to Blue Bear.  Blue Bear was

11   responsible to provide accounting records reports on a regular

12   and frequent basis to the IFCs.  Blue Bear was responsible to

13   manage all of the checking accounts of the IFCs.  Blue Bear was

14   responsible to provide audited financial statements to the IFCs.

15   Blue Bear was responsible to identify and take action to correct

16   bad debt and so notify the IFCs.  Blue Bear was responsible to

17   notify the IFCs and advise them of their individual

18   participation's and different accounts or clients that Blue Bear

19   had.

20      Q     Now, would you say that as a result of some of those

21   duties that Blue Bear was aware of the financial condition of all

22   the IFCs?

23      A     Yes, I would.

24      Q     And is aware of the financial condition of the IFCs?

25      A     Yes, I would.

1      Q     And are you familiar with the settlement, sir?

2      A     Yes, I am.

3            MR. JESSOP:  May I approach the witness, Your Honor?

4            THE COURT:  You may.

5            MR. JESSOP:  (Inaudible)?

6    BY MR. JESSOP:

7      Q     Hand you what's been marked as Exhibit 18.  Can you

8    identify this document, sir?

9      A     I can.  It is the agreement to settle controversy.

10     Q     And is this the subject of today's motion that we're

11   trying to prove this settlement that's embraced in here?

12     A     It is.

13     Q     What -- in basic terms, what does this settlement

14   provide?

15     A     This settlement provides a full and unconditional

16   release to the IFCs of any obligations that might exist between

17   themselves and Blue Bear in exchange for the turning over of all

18   monies present in the existing and the bank accounts of the IFCs.

19     Q     Now, you -- were you involved in the settlement

20   process?

21     A     I was.

22     Q     And how long did that go for?

23     A     Months.  Sir, I -- I -- I couldn't really tell you that

24   -- when it started, but been a long time.

25     Q     And what kind -- did you have conversations with people

1   about this?

2       A    Many conversations with -- with many different --

3   different people with regard to it.

4       Q    Did you have conversations with the IFCs?

5       A    I did.

6       Q    And did they have claims?  Did the IFCs --

7       A    Yes, the IFCs certainly did have claims.

8       Q    Well, what kind of claims did Blue Bear have against

9   the IFCs?

10      A    Well, can you be more specific?

11      Q    Well, we're having a settlement and we're getting paid

12  money and what did Blue Bear believe was owed by the IFCs to Blue

13  Bear?

14      A    Well, I -- Blue Bear felt they were certainly owed for

15  the services and work that they had performed on behalf of the

16  IFCs.

17      Q    How about transfers made in the year prior?

18      A    And certainly we're owed on transfers made prior to the

19  pre-petition of the bankruptcy.

20      Q    And do you recall that that was around 2.5 million?

21      A    I don't -- and, yes, actually it was a little bit over

22  $2.5 million.

23      Q    And what were the defenses that -- now focusing just on

24  the avoidance claims that Blue Bear had.  What defenses could the

25  IFCs assert?

1      A      Well, they could assert that they were -- had not been

2   provided with the necessary and proper information as provided

3   for in the support services agreement.

4      Q      Okay.   What other kinds of claims do they have?

5      A      They could claim that there was a -- potential acts of

6   fraud committed.

7      Q      Now, how did you assess the strength of the IFC's

8   claims?

9      A      Well, I think I assessed it in -- in --

10          MR. WEISS:  Objection, Your Honor, lack of foundation.

11   He said he knows what the potential claims are, but there's no

12   basis for him to know as a matter of law or otherwise how strong

13   or weak those are.   That's a legal conclusion.

14          MR. JESSOP:  He just test --

15          THE COURT:  Overruled.

16          THE WITNESS:  Repeat the question, please?

17   BY MR. JESSOP:

18      Q      Sure.   How did you assess the strength of the IFC

19   claims against Blue Bear?

20      A      By consulting with and having numerous and lengthy

21   conversations with Blue Bear's attorneys.

22      Q      Okay.   Without going into anything that's privileged,

23   what did you think of the probability of success on the IFC

24   claims against Blue Bear?

25      A      I believe they had a high degree of probability.

1    Q    And what did you think of the probability of success of
2    Blue Bear's claim against the IFCs?
3    A    I believe they had a high degree of probability.
4    Q    Now, did you look at collectability, sir?
5    A    I did.
6    Q    And what did you think about collectability of any
7    judgment of -- against the IFCs?
8    A    Well, I -- it certainly had a -- a limited -- the --
9    the level of collectability would be severely limited without
10   taking into consideration how much was in the bank accounts of
11   the IFCs at the time.
12   Q    Well, when you say without taking --
13   A    Without taking consideration.  It was a very good
14   degree of recovery if we took the -- the $630,000 existing in the
15   bank accounts.
16   Q    Now, did they have any other assets that you were aware
17   of, the IFCs?
18   A    Yes.
19   Q    And what would that be?
20   A    To the ex -- to the extent of whether or not there was
21   $2.5 million available in assets.
22   Q    Oh, okay.  You're -- I'm asking what assets did you
23   think the IFCs had?
24   A    None other.
25   Q    Oh, okay.  Now, what did you think about the complexity

1 | and expenses of litigation?

2 |     A    I thought it would be astronomical and -- and in -- in

3 | the end there might not be nothing left.

4 |     Q    Now, why do you believe that this settlement is in the

5 | best interests of the creditors?

6 |     A    Because it provides to the creditors the money, which

7 | they obviously put in to begin with, and it allows their

8 | designated representative the unsecured Creditor's Committee to

9 | have funds available to take action, which in the end, results in

10 | the overall benefit monetarily and financially to those

11 | creditors.  It is -- simply stated, it is their money; it is

12 | their right to do with it as they choose.

13 |     Q    How does this settlement compare in reasonableness to

14 | past settlements you've been involved in?

15 |     A    Very reasonable.  In fact, surprisingly so when

16 | compared to past settlement in which I've been involved.  Banks

17 | accounts were major issues of contention.

18 |             MR. JESSOP:  No further questions.

19 |             THE COURT:  Mr. Weiss, I've got -- I have -- I'm not

20 | going to characterize this as direct or cross or anything else --

21 |             MR. WEISS:  Nor am I, Your Honor.

22 |             THE COURT:  -- but it's your turn.

23 |             MR. WEISS:  I think that's an appropriate

24 | characterization.

25 | ///

1                                 RE-EXAMINATION

2   BY MR. WEISS:

3       Q    Mr. Davis, do you think Blue Bear owes money to the

4   investors?

5       A    Do -- yes.

6       Q    Do you think the IFCs owe money to the investors?

7       A    Well, yes.  They had money in the bank and my opinion

8   is the investor's money.

9       Q    So, why didn't you just provide for the money to go to

10  the investors?

11      A    Because I believe that -- that -- that the alternative

12  opportunity that was provided and discussed would allow the

13  investors to take $630,000 and selectively using it in a proper

14  and judicious -- judicious way, realize a greater return for the

15  investor and that is the real question.

16      Q    Can you point to any place in this agreement that says

17  this is investor money?

18      A    I don't believe so.

19      Q    So if I'm the hypothetical investor who got a copy of

20  this as part of the motion process to approve the settlement, I

21  have no clue that Blue Bear did not contest the fact that this

22  was really the investor's money; isn't that right?

23      A    I can't speak for the investor.  I don't know.

24      Q    Well, is there anything in document that's been marked

25  as Exhibit 18, which says, dear investor, this is your money that

1    we're hoping to upstream for the purpose of litigating?

2        A    No, I don't believe it says that.

3        Q    Is there any place else that the investor would have

4    been told that?

5        A    Verbally or in writing?

6        Q    In writing.

7        A    Not that I recall.

8        Q    So the hypothetical investor was not informed of that?

9        A    I -- I don't know, Mr. Weiss.  I mean I -- that the --

10   the real investors that I talked to certainly understand and

11   consider the money that is represented by the IFCs to be their

12   money and I can only speak to that.

13       Q    Who are the other creditors, the IFCs, besides Blue

14   Bear and the investors?

15       A    I'm not sure.  The other creditors against the IFCs?

16       Q    Yes.

17       A    Besides Blue Bear and the investors?  I'm not sure, Mr.

18   Weiss.

19       Q    Do you think there are any?

20       A    Potentially, yes, I'm sure.

21       Q    And who potentially you think those might be?

22       A    I really don't know.  I just assume that there are

23   several (inaudible).

24       Q    And your testimony on examination by Mr. Jessop is the

25   $630,000 as far as you know is all of the assets.

1      A     As far as I know.

2      Q     So doesn't the impact of the settlement, if approved,

3  is to make the settling IFCs essentially nothing but a shell?

4      A     No, I don't believe so at all.  I think it is a -- it

5  is a settlement between the in -- the investors of Blue Bear

6  wherein both sides agree that that money can best be used today

7  in the pursuit of additional business and litigation against

8  people where potential recoveries can be given.  And I've had

9  investor after investor after investor say that to me.

10     Q     What would an IFC have if the settlement is approved?

11     A     It would full and unconditional releases to itself, as

12 I understand it.

13     Q     Would they have any assets?

14     A     No, not to my --

15     Q     Would it have any liabilities that you know of?

16     A     Not to my knowledge.

17     Q     So it would be a shell.

18     A     A shell?

19     Q     Yes.

20     A     Why would it be a shell, Mr. Weiss?

21     Q     Well, do you have any ability to engage in business?

22     A     No, it would be closed.

23     Q     Isn't that being a shell?

24     A     No, I -- well, not to my definition.

25     Q     Was the IFC money ever segregated?

1      A     Ever segregated?

2      Q     Yes.

3      A     Yes.

4      Q     So, there was an IFC account for, say, Sunflower

5   Factoring, LLC?

6      A     There was a bank account for Sun Factoring, LLC, yes,

7   sir.

8      Q     And that was separate funds from Sierra, separate from

9   Sage, separate from all the various other --

10      A     Yes, sir.

11      Q     -- and separate from Blue Bear?

12      A     Yes, sir.

13      Q     Isn't that contrary to representations that have been

14   made to this Court over the last year?  The debtor did not, in

15   fact, maintain separate cash accounts?

16      A     No, I don't be --

17      Q     That all the money went into the operating account?

18      A     No, I don't believe it's contrary.  I know that -- that

19   when I came onboard for -- at the Blue Bear level we established

20   separate bank accounts for Blue Bear's expenses and payroll and a

21   specific bank account for operating.

22      Q     Had that historically been the case?

23      A     That had not prior been the case.

24      Q     Okay.  So that prior to the bankruptcy, Blue Bear had

25   an operating account, which had its money, the IFCs money --

```
 1        A     Could have --

 2        Q     -- who knows who else's money.

 3        A     It could have.  It could have been co-mingled, Mr.

 4   Weiss.

 5        Q     And, in fact, it could have had money from some other

 6   Karst entities for all you know?

 7        A     For all I know.

 8        Q     So, business from formalities were not observed; were

 9   they?

10        A     At what point in time, Mr. Weiss?

11        Q     Prior to the filing of those bankrupts.

12        A     Oh, yes, they were prior to the filing of the

13   bankruptcy by myself.

14        Q     By the company?

15        A     Correct.  I established the accounts and stopped the

16   co-mingling when I took it over and that is prior to bankruptcy,

17   Mr. Weiss.

18        Q     Prior to your administration, did it observe business

19   formalities?

20        A     Not in my judgment.

21        Q     Were there proper accounts prepared for each IFC?

22        A     I really couldn't testify to that unless you could tell

23   me what you mean by proper accounts.

24        Q     Were separate subsidiary ledgers maintained for each

25   IFC?
```

```
 1        A    The --
 2             MR. JESSOP:  Objection, foundation.  He's just
 3   identified them as subsidiaries.
 4             THE COURT:  Overruled.
 5             THE WITNESS:  Could you repeat the question?
 6   BY MR. WEISS:
 7        Q    Were subsidiary ledgers prepared for each IFC account?
 8        A    I'm not an accountant, so I don't know if there's
 9   subsidiary ledgers, but -- but there was an accounting system
10   that they were using before I got there to track IFCs.
11        Q    If an investor in one IFC got paid, do they get paid
12   out of funds of that IFC or do they just get paid out of a slot
13   -- out of a general account that was maintained by Blue Bear?
14        A    Prior to the time I got there, Mr. Weiss?
15        Q    Yes.
16        A    I don't know.  It don't appear to have been paid out --
17   they appear to have been paid out of general funds.
18        Q    So, that if I'm a Sage investor, I might have actually
19   gotten paid with money that came from a Sunflower receivable?
20        A    I would say that possibility definitely existed prior
21   to my arrival.
22        Q    Based upon your experience as a businessperson, is that
23   observing corporate formalities?
24        A    Absolutely not.
25        Q    Do you believe that Blue Bear and/or the IFCs were
```

1  engaged in fraudulent activities prior to your tenure?

2      A    I have yet to -- I have yet to form a -- a concluding

3  opinion on that matter, Mr. Weiss.  I want to see further

4  definition in the court before I draw that conclusion.

5      Q    What's your opinion?

6      A    Sir?

7      Q    What's your opinion?

8      A    My opinion is that fraud was committed.  Now, let us be

9  specific; prior to my taking over Blue Bear.

10     Q    Do you believe that fraud was isolated to Blue Bear?

11     A    In -- just to Blue Bear the company?

12     Q    Yes.

13     A    I don't know.  I mean I only look at it related to Blue

14 Bear.

15     Q    Well, do you think the IFCs may have been guilty of

16 some fraudulent activities?

17     A    I don't believe so.  But, again, Mr. Weiss --

18     Q    Who --

19     A    -- I -- I defer to the court to determine that.

20     Q    Based upon your knowledge of the company, who solicited

21 the investors?

22     A    Based on my knowledge of the company, the solicitation

23 of investors was a combination of individuals who might -- who

24 later become executive directors of the IFC, Mr. and Mrs. Makey

25 (ph), Mr. and Mrs. Donawho (ph).  To a lesser extent, Mr.

1   Disburger (ph) and Mr. Karst.

2        Q    So that the IFCs were soliciting, at least in part,

3   were soliciting the investors?

4        A    Yes, to the best of my knowledge.

5        Q    And if that solicitation was in violation of security's

6   laws, the IFCs, presumably, would be guilty of violating

7   security's laws.

8        A    I suppose so if the IFCs knowingly, willfully aided and

9   abetted in that, but I don't believe that happened.

10        Q    Well, if I'm the investor, do you think I have a claim

11   against the IFCs and Blue Bear?

12        A    Are you asking my personal opinion of this matter?

13        Q    Yes.  The only thing you can give.

14        A    I think that possibility exists, yes.

15             MR. WEISS:  No further questions, Your Honor, as to the

16   IFC issue.

17             MR. JESSOP:  Your Honor, Mr. Young would like to have

18   an opportunity in the midst of this scrambled --

19             THE COURT:  Mr. Young, go ahead.

20             MR. JESSOP:  Then I'll follow-up.

21             MR. YOUNG:  I'd like to confer with Mr. Jessop

22   (inaudible) for about a minute.  I --

23             THE COURT:  Well, we've been going for better part of

24   an hour and a half.  Was -- is this a good time to take the

25   morning break?

```
 1              MR. YOUNG:  I think so.  Sure.

 2              THE COURT:  And we also may have return momentarily --

 3              UNIDENTIFIED SPEAKER:  Mr. Miller.

 4              MS. WOLF-SMITH:  With Mr. Miller.

 5              THE COURT:  -- with Mr. Miller and Mr. Weiss may or may

 6   not have remaining re-cross of him, but let's break till five

 7   minutes till 11 and then we'll continue with Mr. Davis.

 8              THE CLERK:  All rise.  This Court is in recess.

 9              (WHEREUPON, the morning recess was taken.)

10              THE COURT:  Just sit there.  Resume the witness stand,

11   if you would?

12              Mr. Young, do you wish to examine?

13              MR. YOUNG:  Briefly, Your Honor.

14              THE COURT:  Mr. Davis, of course, you remain under

15   oath.  Thank you.

16              THE WITNESS:  Yes, sir.

17              THE COURT:  Mr. Young?

18              MR. YOUNG:  Thank you, Judge.

19                        DIRECT EXAMINATION

20   BY MR. YOUNG:

21      Q    Mr. Davis, John Young on behalf of the IFC committee.

22      A    Good morning, Mr. Young.

23      Q    And I wanted to focus on one area of Mr. Weiss's

24   examination in regard to Mr. Weiss had asked you about the

25   settlement agreement, and the fact that there was no specific
```

1    language in the agreement that said the money being transferred

2    under the settlement belonged to the investors; do you recall

3    that --

4        A    Yes, I do.

5        Q    -- testimony?  And you've met with the investors on

6    several occasions; haven't you?

7        A    Yes, I have.

8        Q    And to your knowledge based on your meetings with the

9    investors, did the investors believe that the money being held by

10   the IFCs is their money?

11       A    Yes, they do.

12       Q    And there's no doubt in their mind that this money

13   belongs to them in their opinion?

14       A    None whatsoever.

15       Q    Now, in regard to the choices facing the IFCs and the

16   debtor in regard to the funds being held by the IFCs are these,

17   and see if you'll agree with me on this, want to make -- the

18   monies can be transferred under the settlement agreement to the

19   debtor; correct?

20       A    Correct.

21       Q    That's an option?

22       A    Correct.

23       Q    Another option would be to return these monies to the

24   investors; correct?

25       A    Correct.

1    Q    And a third option available to the IFCs would be to do

2  nothing, keep the money, and I guess wait for the litigation to

3  start --

4    A    Correct.

5    Q    -- right?  Of these three options available to the IFCs

6  and based on your meeting with the investors, is it the

7  investor's desire that the monies be transferred to the debtor

8  pursuant to the settlement?

9    A    Yes, sir.

10           MR. YOUNG:  Those are all the questions I have, Your

11  Honor.

12           MR. JESSOP:  Nothing further, Your Honor.

13           THE COURT:  Mr. Weiss, want any direct?

14           MR. WEISS:  Very, very briefly.

15                     REDIRECT EXAMINATION

16  BY MR. WEISS:

17    Q    Mr. Davis, did you meet all the investors?

18    A    No, I did not.

19    Q    So, you don't know what all the investors think?

20    A    No, I have an opinion.

21           MR. WEISS:  No further questions.

22           THE COURT:  Anyone else wish to ask questions of this

23  witness?

24           I'm not sure if we'll bring you back, but you're done

25  for this round.  Thank you, Mr. Davis.

1              THE WITNESS:  Thank you, Your Honor.

2              MR. WEISS:  Your Honor, I think the next question is

3    another one of those procedural quirky things.  I think it's Mr.

4    Miller that's next on recross and then we go into Mr. Jessop's

5    direct of Mr. Miller for the IC settlement.  Is that your

6    understanding, as well?

7              MS. WOLF-SMITH:  We don't -- we don't have --

8              MR. JESSOP:  I think we've decided based on what we

9    have so far it'll be -- we'll be done.

10             MR. WEISS:  So, you're not going to call Mr. Miller --

11             THE COURT:  Well, let's take it a step --

12             MR. WEISS:  -- for that purpose?

13             THE COURT:  -- one step at a time.  We have Mr. Weiss's

14   -- I believe it's recross examination of Mr. Miller.

15             And, Mr. Miller, thank you for returning.  I appreciate

16   your availability today.

17             And unless counsel tells me that there's a reason to

18   proceed otherwise, let's get Mr. Miller back to the witness stand

19   and allow the U.S. Trustee to complete his examination and then

20   he will be free to go at that point and we'll see where we are at

21   that juncture.

22             Mr. Miller, would you please return to the witness

23   stand?  You remain under oath.

24             THE WITNESS:  Yes, sir.

25             THE COURT:  This is the continuation of your

1   examination from yesterday.  And just so the record is clear, Mr.

2   Miller had been called to testify by the Plan Proponents and had

3   been cross-examined by the United States Trustee and by Mr.

4   Karst's counsel.  There was redirect by -- that was -- actually

5   conducted by the Creditor's Committee and the U.S. Trustee ran

6   out of time before Mr. Weiss had an opportunity to recross on Mr.

7   Miller.  Lord only knows what the scope of the direct was.

8            MR. JESSOP:  Very, very narrow.

9            THE COURT:  But so there will be some leeway because I

10  don't remember, Mr. Weiss, and I have no idea.  I have rather

11  copious notes, but we will continue and complete Mr. Miller's

12  testimony.  We now have the recross by the U.S. Trustee and you

13  do remain under oath, Mr. Miller.

14           THE WITNESS:  Thank you.

15           THE COURT:  Please --

16           MR. WEISS:  Thank you, Your Honor.

17           THE COURT:  -- proceed, Mr. Weiss.

18           MR. WEISS:  Promise 15 minutes and I think I'm going to

19  make it.

20                      JOHN MILLER,

21  a witness, called by plan proponents, was examined and testified

22  as follows:

23                   RECROSS EXAMINATION

24  BY MR. WEISS:

25       Q    Mr. Miller, you remember testimony yesterday about

1    soliciting assignment of the litigation claims?

2         A    Yes.

3         Q    Do you remember Exhibit 16 was the form used for that?

4         A    Yes.

5         Q    Do you have a copy of Exhibit 16 in front of you?

6         A    There's one here some place or there was yesterday.

7    Here it is.

8         Q    Okay.  Were you present at the meeting that that form

9    was handed out to investors?

10        A    The form was mailed to investors, not handed out.  It

11   was also made available at a general meeting July 18th to those

12   persons who had lost or forgotten the form.

13        Q    Was there anything else mailed out to them besides that

14   form?

15        A    There was a letter with the form that came from the two

16   -- the two of us who serve as the -- the co-chairs of the

17   committee.

18        Q    Do you have a copy of that letter?

19        A    I don't have one with me, but I'm sure we can get one.

20        Q    Do you remember what substance that letter was?

21        A    Basic -- well, in general, it was an explanation of

22   Exhibit 16 and that we were asking that they read carefully

23   through the material and return it with a vote one way or the

24   other.

25             THE COURT:  Excuse my interruption.  I'm sorry to do

1    this.  Could you repeat the date of the general meeting you

2    referred to?

3              THE WITNESS:  July -- I believe it was Tuesday,

4    July 18 --

5              THE COURT:  Thank you.  I'm sorry.

6              THE WITNESS:  -- in the evening.

7              THE COURT:  I'm sorry for the interruption.  Go ahead,

8    Mr. Weiss.

9    BY MR. WEISS:

10        Q    You signed the letter.  Who else signed the letter?

11        A    Mr. Ritter, who's the other co-chair.

12        Q    Who drafted the letter?

13        A    The letter was drafted by counsel.

14        Q    Okay.  Looking at four corners of Exhibit 16, reading

15   the text of that document, does it advise investors to seek

16   independent legal advice?

17        A    (Pause.)  Not on Exhibit 16.

18        Q    Is there anything conspicuously set aside on any of the

19   paragraphs in that document?

20        A    I believe E from my reading, which states I acknowledge

21   and understand that by transferring my litigation claims to the

22   Creditor's Committee, I will be giving up any rights to prosecute

23   or pursue such litigation claims myself.

24        Q    How long was the letter --

25        A    Two pages in length.

1    Q    -- that was sent out?

2    A    Well, the letter was one page in length.  I'm sorry.

3    One --

4    Q    Can you describe all the --

5    A    -- no, two pages --

6    Q    -- litigation claims that potentially you and Mr.

7    Ritter on behalf of the committee thought would be released by

8    investors if they signed this release or signed, I should say?

9    A    Would you repeat the question, please?

10   Q    The two-page letter that was mailed out --

11   A    Yes.

12   Q    -- did that tell the investors what exact litigation

13   claim -- what exact claims that the committee thought these

14   investors were assigning --

15   A    I -- I believe the letter, in general, referred the

16   omnibus leg -- or litigation, such as --

17   Q    Did it define what the claims were in the omnibus

18   litigation?

19   A    Yes, I believe in general it did.

20   Q    Did it say who the targets were?

21   A    The targets as listed in the plan and everyone at that

22   point had a copy of the plan.

23   Q    Does the plan identify any particular targets of the

24   litigation?

25   A    It -- it has a long list of potential targets of

1    litigation.

2        Q    Does it identify the claims against each of those

3    individuals?

4        A    No, it does not to the best of my knowledge.

5        Q    Does it differentiate between the claims that might be

6    Blue Bear's claims as distinct from the investor's claims?

7        A    No, I believe it's -- these are claims -- no, I do not

8    believe it differentiates.  These are simply claims that we

9    believe we could pros -- prosecute.

10       Q    What occurred at the July 18th meeting with respect to

11   these assignments?

12       A    The July 18th meeting consisted of a presentation by

13   Mr. Collins, which was a Power Point presentation of the

14   financials and the projections.  And following that, both Exhibit

15   16 was put up on an overhead for the creditors in attendance so

16   we could walk them through that form and the deadline for getting

17   that in with our appropriate.  And, also, we reviewed the vote on

18   acceptance of the plan.  So, there were two documents.

19       Q    Had people completed -- to the best of your knowledge,

20   had people completed the assignments prior to that meeting?

21       A    To the best of my knowledge, a number of people did.

22   There were people, obviously, that night that still had not

23   completed their vote on the plan.

24       Q    If this form was completed prior to the meeting, was it

25   mailed back to somebody?

1    A    Yes.

2    Q    To whom was it mailed?

3    A    If -- if you were voting on acceptance of the plan, you

4    mailed the plan back to Jessop & Associates.  If you were voting

5    on Article 16, the assignment litigation claims, it went back to

6    Holland & Hart.

7    Q    Ms. Wolf-Smith's firm --

8    A    Yes.

9    Q    -- in other words?  And people were supplied an

10   envelope for that purpose?

11   A    They were not supplied an envelope for that purpose.

12   Q    The letter told them here's the address to mail it to?

13   A    Correct.

14   Q    Do you have any knowledge how many people executed this

15   assignment prior to the July 18th meeting?

16   A    Prior to the July 18th meeting?

17   Q    Yes.

18   A    I have -- as I recall, no, I have no --

19   Q    Do you have any idea how many people executed at the

20   July 18th meeting?

21   A    I have a general opinion of how many people executed it

22   by the deadline.

23   Q    What's your best guess of that number?

24   A    Two hundred and -- 250 -- 260 people.

25   Q    But you have no idea how many did it after the meeting

1   and how many did it at the meeting and how many did it before the

2   meeting?

3      A    That's correct.

4      Q    Do you know of anybody that does?

5      A    Only by the postmarks of the receipt date that might be

6   available in the -- in the offices of Holland & Hart.

7      Q    Mr. Miller, are you familiar with the IFC settlement?

8      A    In general terms, yes.

9      Q    Mainly (inaudible) $630,000 that's at issue in that

10  settlement?

11     A    Yes.

12     Q    Whose money do you think that is?

13     A    I think it belongs to the creditors.

14     Q    Would it surprise you that Mr. Davis testified that he

15  thought that was investor money, too?

16     A    I'm sorry?  That --

17     Q    Wouldn't it surprise you that Mr. Davis testified he

18  thought it was the investor's money?

19     A    No.

20     Q    As a committee member, as well as an investor, do you

21  believe the IFCs engaged in any fraudulent conduct?

22     A    At this point I'm not sure I can determine that.

23     Q    Do you think the IFCs did right by everybody?

24     A    I only know one IFC personally, so I can only judge on

25  the person I know.

1      Q    Do you think that individual did?

2      A    I think that individual was -- was up front with -- at

3  least with me on explaining what I was investing in, what the

4  degree of risk might be, and making sure that I was a qualified

5  investor.

6      Q    Have you spoken to a number of other investors?

7      A    Yes.

8      Q    And sense that all the investors got that kind of

9  disclosure?

10      A    That's not been necessarily a topic of the discussion

11  with other investors.

12      Q    But has it come up?

13      A    Yes, it's come up.

14      Q    Based upon the times that it's come up, what would your

15  conclusion be?

16      A    I -- I don't believe that most investors fault the

17  IFCs.  I believe most investors fault other parties in this case.

18      Q    Do they fault Blue Bear?

19      A    They fault Blue Bear in its previous --

20      Q    First American --

21      A    -- operations.

22      Q    -- Factoring?

23      A    Hmm?

24      Q    And First American Factoring, it's --

25      A    And First American Factoring, yes, sir.

```
 1        Q     The Maky's?

 2        A     Possibly.

 3        Q     Donawho's?

 4        A     Possibly.

 5        Q     Mr. Disburger?

 6        A     Possibly.

 7        Q     Mr. Karst?

 8        A     Possibly.

 9        Q     So from your discussions, does it seem like the

10   investors think they have claims against a lot of folks?

11        A     They have -- they put -- they know -- I -- I believe

12   the typical investor is aware of certain individuals.  I do not

13   believe they are, in general, aware of all the investors that may

14   be targeted in the omnibus leg -- or the omnibus lawsuit.

15        Q     Different question.  Do you think investors think they

16   have claims against a lot of people?

17        A     I think they may think they have, but I have had very

18   few investors tell me that they wish to take independent legal

19   action against any parties.

20              MR. WEISS:  No further questions, Your Honor.

21              THE COURT:  Further examination of Mr. Davis?

22              MR. WEISS:  Mr. Miller.

23              THE COURT:  I'm sorry, I'm sorry.  Poor Mr. Davis, he's

24   been up and back so times.  Mr. Miller, I apologize.  I'm sorry.

25              THE WITNESS:  No, it's -- it's no problem.  This has
```

1   been so much fun, it's like getting a second master's degree.

2          THE COURT:  Ms. Wolf-Smith, proceed.

3                        EXAMINATION

4   BY MS. WOLF-SMITH:

5      Q     Mr. Miller, do you recall yesterday's discussion about

6   the letter that -- or the assignment of claims form and when that

7   might have gone out?

8      A     Yes.

9      Q     And have you had occasion to go back to your office and

10  look at when you believe the letter that accompanied the

11  assignment of claim form was signed and faxed to our office?

12     A     Yes, and our records reflect that that date was 14

13  July.

14     Q     Okay.  You talked about a deadline and was there a

15  deadline for the ballots to be returned to Ms. White's office?

16     A     Yes, and -- and don't hold me to this, but I believe it

17  was the 26th or the 28th of July.

18     Q     Now, was there a deadline for the assignment of claim's

19  form to be returned?  Was there any dead --

20     A     I'm -- I'm sorry.  I don't recall.

21     Q     Okay.

22     A     I -- I don't think there's anything in Exhibit 16 that

23  talked about that.  It would have been the cover letter that went

24  with Exhibit 16.

25     Q     Are you aware of anything in the plan that requires

1    investors to assign their claims to the committee in order to

2    receive stock in the debtor?

3        A     No.

4              MS. WOLF-SMITH:  That's all I have, Your Honor.

5              THE COURT:  Anybody else wish to ask Mr. Miller

6    questions --

7              MR. JESSOP:  I have nothing and not sure procedurally

8    it would have any basis to do it anyway, if I did.

9              MR. WEISS:  We'll stipulate to that, Your Honor.

10             MR. JESSOP:  I think we're --

11             THE COURT:  I'm about to excuse this witness if there

12   isn't an objection.

13             MR. JESSOP:  We're done, Your Honor.

14             THE COURT:  Mr. Miller, again, thank you for returning.

15   You're, of course, most welcome to stay as a principal.

16             THE WITNESS:  Well, with your permission I believe I'd

17   like to.  This is three days I've given up so I might as well

18   stay to the conclusion.

19             THE COURT:  Well, good.  You're most welcome to do so.

20   All right, counsel.  I appreciate your cooperation in

21   streamlining the evidentiary process.  It does leave me a little

22   uncertain as to who I ask or has any further witnesses on what

23   subject, so I'll ask any of you if you wish to present further

24   witnesses on objections to the plan or in support of the plan.

25             Let's do that first.  Do the proponents have further

```
 1   witnesses or do you rest on confirmation?

 2             MR. JESSOP:  We rest on confirmation, Your Honor.

 3             THE COURT:  Ms. Wolf-Smith, was that --

 4             MS. WOLF-SMITH:  Yes, Your Honor.

 5             THE COURT:  -- your position --

 6             MS. WOLF-SMITH:  We rest.

 7             THE COURT:  -- on the Creditor's Committee.  All right.

 8   Mr. Weiss, be -- let's take these things one thing at a time.  Do

 9   you wish to call witnesses in opposition of the -- to the plan?

10   You are the only continuing participating objector at this point.

11             MR. WEISS:  I think that is a fair statement, Your

12   Honor.  I have one very brief witness, Ms. Brinkman.

13             THE COURT:  Very good.  Ms. Brinkman?

14             MR. WEISS:  Call Ms. Virginia Brinkman --

15             THE COURT:  Would you --

16             MR. WEISS:  -- to the stand.

17             THE COURT:  -- please step forward, Ms. Brinkman, and

18   if you would step this way and be sworn, we'll then ask you to

19   sit in the witness box.

20             THE CLERK:  Do you solemnly swear that the testimony

21   you are about to give in this proceeding shall be the truth, the

22   whole truth, and nothing but the truth under penalty of perjury?

23             THE WITNESS:  Yes.

24             THE COURT:  And, Mr. Weiss, wait one moment while I

25   catch up.
```

```
 1              (Pause.)

 2              THE COURT:  Please proceed, Mr. Weiss.

 3              MR. WEISS:  Thank you, Your Honor.

 4

 5                          VIRGINIA BRINKMAN,

 6    a witness, called by the U.S. Trustee, was examined and testified

 7    as follows:

 8                          DIRECT EXAMINATION

 9    BY MR. WEISS:

10        Q    Good morning, Ms. Brinkman.

11        A    Good morning.

12        Q    I'm going to have you turn to Exhibits 6 and 7 in the

13    notebook in front of you.

14              THE COURT:  Let's get the witness's full name on the

15    record, Mr. Weiss.

16              MR. WEISS:  Okay.  Let's --

17    BY MR. WEISS:

18        Q    Ms. Brinkman, you --

19        A    Virginia Lynn Brinkman.

20              THE COURT:  Thank you, Ms. Brinkman.  And which exhibit

21    are we turning to?

22              MR. WEISS:  6 and 7, Your Honor.

23              THE COURT:  Thank you.  I think there's a blue notebook

24    there.  And can you find --

25              THE WITNESS:  Yes.
```

```
 1              THE COURT:  -- what he's asking about?
 2   BY MR. WEISS:
 3       Q    Ms. Brinkman, are you familiar with those documents?
 4       A    Yes, I am.
 5       Q    Why are you familiar with them?
 6       A    Exhibit 6 with Silver Mountain Financial, which Sierra
 7   Factoring has invested in Silver Mountain Financial.
 8       Q    And with respect to Exhibit 7?
 9       A    Exhibit 7 is the third party complaint, I believe is
10   how you define it, and my name is in -- on this document.
11       Q    Do you have some ownership interest directly or
12   indirectly in Silver Mountain?
13       A    Yes, I do.
14       Q    Are you familiar with $1.1 million receivable that we
15   were earlier discussing the projections show it would come in in
16   January?
17       A    Yes.
18       Q    Do you believe the litigation represented by Exhibit 6
19   and 7 concerns that receivable?
20       A    I believe that it does.
21       Q    Based upon your knowledge of the status of the
22   litigation represented by Exhibit 6 and 7 and your role in Silver
23   Mountain, do you believe that that litigation will be resolved by
24   January of 2007?
25              MR. JESSOP:  Objection, founding -- no foundation and
```

1    leading.

2            THE COURT:   Sustained.

3    BY MR. WEISS:

4        Q    Ms. Brinkman, are you familiar with the litigation?

5        A    I'm not that -- I'm familiar with these litigation's

6    that I'm involved in, but I'm not familiar with the laws of

7    litigation's.

8        Q    Are you familiar with how far along in the process they

9    are?

10       A    Yes, I am.

11       Q    How would you describe the status of those pieces of

12   litigation?

13       A    They are both still in litigation between Mr. McCartney

14   (ph) on the Silver Mountain and Mr. Jessop and through the

15   courts.  And then on Exhibit 7, the answers for all of the third

16   party plaintiffs, I believe, have been filed with the courts, as

17   well.

18       Q    Are you familiar with any court settlement conferences?

19       A    Not that I'm aware of.

20       Q    Are you familiar with any court scheduling conferences?

21       A    Not that I'm aware of.

22       Q    Are you familiar with any motions that are pending

23   before the court with respect to litigation, which would resolve

24   it?

25       A    I am familiar with motions that have been filed, but

 1   nothing has been answered, to my knowledge.

 2        Q    To anticipate conceding the claims for against you and

 3   Silver Mountain?

 4        A    That I know the documentation that Silver Mountain and

 5   myself have in conjunction to these to prove our ownership in the

 6   Silver Mountain with the Star Rider, as well as the fact I do --

 7   am familiar with the things in Exhibit 7 that pertain to myself,

 8   Virginia Brinkman, and to how the allegations and our answers and

 9   response to those.

10        Q    Do you intend to vigorously litigate those actions?

11        A    Yes.

12             MR. WEISS:  No further questions, Your Honor.

13                       CROSS-EXAMINATION

14   BY MR. JESSOP:

15        Q    Good morning, Ms. Brinkman.

16        A    Good morning.

17             THE COURT:  Just a minute, please.

18             (Pause.)

19             THE COURT:  Go ahead, Mr. Jessop.  Cross-examination of

20   this witness by the debtor.

21             MR. JESSOP:  Thank you, Your Honor.

22   BY MR. JESSOP:

23        Q    Ms. Brinkman, you are a managing member of Silver

24   Mountain; is that correct?

25        A    That's correct.

1      Q      And Sierra received in March approximately how much

2  money?

3             MR. WEISS:  Your Honor, objection, outside the scope of

4  direct.

5             MR. JESSOP:  This is, in part, impeachment, Your Honor.

6             THE COURT:  Over --

7             MR. WEISS:  It's all --

8             THE COURT:  Overruled.

9  BY MR. JESSOP:

10     Q      How much money did Sierra receive from Blue Bear in

11 March of 2005?

12     A      Sierra Factoring received 800 --

13     Q      Or two -- sorry, 2006.

14     A      Six -- 887,000 and some-odd cents that was to pay off a

15 promissory note that Sierra Factoring had with an investor.

16     Q      Okay.  And do you know where that money came from?

17     A      I do know that the money came from Silver Mountain

18 Financial on a property that was purchased out of California that

19 I believe was -- that it was owned by David Karst, CFS, and he

20 asked the money to be wired into Blue Bear Funding's account.

21     Q      Okay.  So, you know precisely where the money came

22 from; don't you?

23     A      Yes, sir.

24     Q      And it just ran right through Blue Bear; correct?

25     A      I believe that it was to pay off a debt that Sierra

1   Factoring had with Blue Bear in exchange for a promissory note

2   with an investor that I had.

3       Q    Now, did you know that that property that Mr. Karst

4   owned was property of Blue Bear's?

5           MR. WEISS:  Your Honor, I think this is outside the

6   scope of direct and I see no impeachment value to this.  My line

7   of direct was simply whether she thought that litigation was

8   going to get resolved by --

9           THE COURT:  Well, Mr. --

10          MR. WEISS:  -- January.

11          THE COURT:  -- Mr. Weiss, you've opened up this

12  litigation to whether or not it's going to be settled here

13  between now and sometime in the near future.  I think cross-

14  examination -- that counsel is free to inquire about the

15  litigation.  Overruled.

16          THE WITNESS:   I was under the impression that the

17  property is owned by NCFS and that is where my promissory note

18  for the exchange of the 900 came through -- the 900,000 came

19  through.  It did not come through Blue Bear by me.

20  BY MR. JESSOP:

21      Q    Now, do you know that that property -- the evidence has

22  shown so far that that property was owned by Blue Bear; is that

23  correct?

24      A    I am not familiar with it saying that it was owned --

25  or seen any evidence 100 percent that it was owned by that.  I

1    have heard, though, that testimony.

2        Q    All right.  Now, you're not the only party in this

3    action; are you?

4        A    No, I am not.

5        Q    In fact, there's a lot of parties?

6        A    Yes.

7        Q    And you don't claim to own all of the interest in the

8    Star Rider or Sun Chaser (ph) asset; do you?

9        A    No, I do not.  We have an agreement with Blue Bear

10   Funding that Silver Mountain Financial would pre -- would

11   purchase invoices that --

12       Q    Uh-huh.

13       A    -- and with that we were allowing -- I don't have the

14   percentages exactly, but I know there was -- as payments came in

15   from Star Rider, Blue Bear would get to keep four percent, I

16   believe, of those proceeds or six percent and the re -- like 20 -

17   - the remainder came to Silver Mountain.

18       Q    So, Silver -- you do know that Silver Mountain, at

19   best, has only a claim to some of the wells in the Star Rider and

20   Sun Chaser; correct?

21       A    We had a bill of sale for an exact percentage.

22       Q    I'd like you to look at Exhibit 8, please.

23       A    (Pause.)  Yeah.

24       Q    And this is a proof of claim filed by Sierra Factoring;

25   do you see that?

1       A    That's correct, yes.

2       Q    Okay.  And if you go -- unfortunately, these pages are

3  not numbered, but if you go into the agreement, you come to -- or

4  into the exhibit a number of bill of sale and security

5  agreements.  And there's like -- once you get to the first one,

6  if you would --

7       A    Exhibit B?

8       Q    That's correct.

9       A    Yes.

10      Q    There's one -- why don't you go one, two, three, four,

11  five, to the sixth.  Do you see that?  And it has three at the

12  bottom -- it says three clients and it -- there's a number of

13  maximum portfolio percentage.  Do you see that?

14      A    Yes, I do.  Is that the one that says Colorado Silk

15  Screening --

16      Q    Right.

17      A    -- Star Rider, and Sun Chaser?

18      Q    And what's the percentage for Star Rider?

19      A    Star Rider is eight percent and Sun Chaser is eight

20  percent.

21      Q    All right.  Now --

22      A    That is under Sierra Factoring, not Silver Mountain.

23      Q    Okay.  And do you claim that this agreement gives you a

24  ownership in that account or is it a security agreement?

25      A    I was under the impression that from day one when I

1    started investing with Blue Bear Funding that the in -- the IFCs

2    would have ownership in each account that we purchased money

3    into.

4         Q    Okay.  So, when you have a ten-percent interest, you

5    didn't really purchase an account; did you?

6         A    At this time when First American Factoring is when it

7    started before they had changed their name to Blue Bear, they

8    were doing a percentage.  I do know that later on they did change

9    to purchase separate invoices.  This one did not have a separate

10   invoice, but I don't believe under Star Rider or Sun Chaser you

11   could purchase exact invoices as much as it was a loan, I

12   believe, some more than an actual factoring.

13        Q    Okay.  So, now let's move to Number 9.  It's a claim of

14   Silver Mountain.  Do you see this proof of claim?

15        A    Yes, I do.

16        Q    Have you ever seen it before?

17        A    Yes, I have.

18        Q    Now, this says it's a secured claim.  Do you see that?

19        A    Yes.

20        Q    Okay.  And are you aware when Silver Mountain or if

21   Silver Mountain filed a UCC?

22        A    I do not believe they did file a UCC on Star Rider

23   specifically.  There was a bill of sale, as well as a deed of

24   trust from Star Rider.

25        Q    Okay.  And do you know how fast in the course of

```
 1   summary judgment motion could proceed?

 2       A    I have no idea.

 3       Q    Okay.

 4            MR. JESSOP:  Thank you.  No further questions.

 5            THE COURT:  Anyone else wish to cross-examine this

 6   witness?

 7            MR. WEISS:  No redirect, Your Honor.

 8            THE COURT:  (Inaudible) if we don't have any further

 9   cross.  Be no further cross, redirect, Mr. Weiss?

10            MR. WEISS:  I have no redirect.

11            THE COURT:  Thank you very much for coming to testify,

12   Ms. Brinkman.  Is there -- is this witness under subpoena?

13            MR. WEISS:  No.

14            THE COURT:  You are free to go.  You're, of course,

15   welcome to stay and spectate (sic) as long as you like.

16            THE WITNESS:  Thank you.

17            THE COURT:  Thanks for coming.

18            MR. WEISS:  I have no further witnesses, Your Honor.

19            THE COURT:  Okay.  So, does the -- if I understand

20   correctly, the U.S. Trustee rests on -- in opposition to

21   confirmation?

22            MR. WEISS:  Correct, Your Honor.  And I think, also,

23   with respect to settlement.

24            THE COURT:  Let's make sure that the proponent

25   (inaudible) settlement have rested before we get the opponents.
```

1    The -- anyone else have any further evidence or rebuttal on

2    confirmation?

3            MR. JESSOP:  We don't, Your Honor.

4            THE COURT:  Very good.  Let's now turn to the

5    settlement motion and is there any further evidence in support of

6    the settlement motion by the debtor's proponent?

7            MR. JESSOP:  We're done, Your Honor.

8            THE COURT:  So, the -- on the settlement motion the

9    debtor rests.

10           Anything now, Mr. Weiss, in opposition -- anything

11   further from the U.S. Trustee?

12           MR. WEISS:  I do not, Your Honor.

13           THE COURT:  On the settlement motion, U.S. Trustee

14   rests.

15           That leaves us with the remaining matter and we may

16   have heard all the evidence that we're going to hear on this.

17   I'm not soliciting further evidence, but I want to give the U.S.

18   Trustee opportunity if there is additional evidence because the

19   Court is going to consider these things, as I've indicated,

20   simultaneously.  The motion for appointment of a trustee or, in

21   the alternative, for a conversion of this case to Chapter 7.  I

22   suppose a conversion motion, almost by its nature, leaves the

23   Court with an option of dismissal, but whatever that --

24           MR. WEISS:  Certainly, Your Honor.  I do not intend to

25   offer any more evidence.  The only other issue with respect to

1   that motion is, obviously, the Court, I think, must first rule on

2   the confirmation and the settlement.  And to the extent that

3   they're relevant, that does get incorporated with respect to

4   the --

5               THE COURT:  Right.  I think -- and am I fair in saying

6   that if --

7               MR. JESSOP:  Yeah.

8               THE COURT:  -- the settlement agreement (inaudible) is

9   approved and the plan is confirmed, we mooted the trustee's

10  motion for a trustee or conversion.  Otherwise, we move on to the

11  trustee's motivation -- or not for further evidence, but with a

12  ruling to either grant or deny.

13              MR. WEISS:  Right.  If the Court denies confirmation --

14              THE COURT:  Right.  Then we face --

15              MR. WEISS:  For whatever reason --

16              THE COURT:  Then we rule on --

17              MR. WEISS:  -- then --

18              THE COURT:  -- the motion to convert or appoint a

19  trustee --

20              MR. WEISS:  Right.  And all I'm saying is I think the

21  Court's ruling with respect to the settlement motion and with

22  respect to confirmation may be some evidence, which is pertinent

23  to the conversion appointment of a trustee and that's all I'm --

24              THE COURT:  In and of itself --

25              MR. WEISS:  Right.  Exactly, Your Honor.

```
 1              THE COURT:  -- as the order if it denies confirmation

 2    goes to whether or not a plan can be confirmed or --

 3              MR. WEISS:  Exactly, Your Honor.

 4              THE COURT:  -- it has promptly been confirmed without

 5    prejudice to creditors for more delay, et cetera.

 6              MR. WEISS:  Exactly, Your Honor.

 7              THE COURT:  Thank you.  Mr. Jessop, you --

 8              MR. JESSOP:  And --

 9              THE COURT:  -- want to add anything to that?

10              MR. JESSOP:  -- we have no more evidence on those

11    matters.  We would, hopefully, reserve the right to speak to the

12    motion for conversion if the plan is not confirmed.

13              THE COURT:  Absolutely.  If the plan is not confirmed

14    -- I think in light of this last exchange, and it's helpful that

15    what we'll hear is argument and then summation on the plan,

16    objections to the plan, the motion on the settlement, and

17    objections to the motion on the settlement.  Those we will hear

18    this afternoon.  I will not hear summation on conversion or a

19    trustee, unless and until the motion to confirm is denied at

20    which point, if it is, we may recall you early next week for

21    final argument -- or we may, depending on what -- when it is

22    today that we get a ruling on this, and I still am going to try

23    to rule today on the settlement and the plan.  We may then ask

24    you to give -- have an hour to gather your thoughts and ask you

25    to argue on conversion, if that's where we find ourselves.
```

1           But I think now what I would propose, the evidence is

2     closed on all three matters, and everybody has rested, is to

3     adjourn at this point and reconvene for summation on the motion

4     to confirm the plan and the application requesting the plan for

5     its confirmation and objections.  And contemporaneously, the

6     motion seeking approval of the settlement with the IFCs and the

7     participating IFCs.

8           Given the fact that I have -- though I'm not making any

9     promises, I am going to try to rule today.  I'm going to take a

10    longer than normal mid-day break so there's some chance to sort

11    through notes and exhibits and what have you before I hear your

12    final arguments.  Then we will probably take another break after

13    your final arguments, so nobody is going to rescue much of his or

14    her Friday, but my guess is -- my thought is that we would

15    reconvene at 2:00 for final argument.

16          Now, my hope is that we might finish that process in

17    half an hour -- I mean an hour to an hour and a half.  And what I

18    would propose doing and, counsel, if I'm putting you in a spot

19    that you -- that doesn't seem reasonable, speak up, but what I'm

20    inclined to do is assign each side, the proponents of the plan

21    and the settlement, 45 minutes to divvy however you like and to

22    assign 45 minutes to the U.S. Trustee and if anyone on Mr.

23    Karst's or his company should -- can come back to participate,

24    and Mr. Weiss, you'll need to split that time, otherwise you got

25    45 minutes as the remaining objector on the plan and the

1    settlement.

2         MR. JESSOP:  Your Honor, I'm sorry.  Do we have a

3    rebuttal (inaudible)?

4         THE COURT:  Well, I'm trying to think; the plan and the

5    settlement.  You've got the burden, so you'll have -- if you want

6    to save any of that 45 minutes for the last word on either of

7    them, that's your prerogative.

8         MR. JESSOP:  I thought that usually if I get X and he

9    gets X amount, I do get like a tenth X or something to come back.

10        THE COURT:  Well, you got 45 minutes and you got a

11   couple hours to figure out how you want to slice and dice it.

12        Let me raise a question or two that I have.  And some

13   of the -- that, perhaps, it would be helpful for the Court -- and

14   I do this -- and I'm not suggesting this is -- we're going to re-

15   open the evidence.  But the Court has its own independent

16   responsibility on confirming a plan under 1129 to be satisfied

17   that the criteria laid out in the plan can be met before the plan

18   is confirmed.  The -- and from a question or two that I had and

19   that you might specifically, if you choose to address in closing,

20   is to speak to some of the timing that the plan contemplates with

21   respect to determinations for classes 3A through 3D and 4A

22   through 4I in terms of the 506(b) kinds of determinations.  I may

23   have read right past it in the plan, but is there some sort of

24   timetable on how and when those resolutions, if you're dealing

25   with cram downs or determinations of secured versus unsecured

1   status of just the mechanics of what the plan contemplates?

2   Similarly on subordination of claims, and I may have read right

3   through it.  It's dealt with at page 13.  The others are dealt

4   with it page 12 and 13 in the plan.  And certainly the settlement

5   is now front and center.  And when I was looking at the plan be

6   -- preparing, if it wasn't, (inaudible) explain on that score.

7           The plan contemplates that -- and we've had testimony

8   concerning the liquidation possible -- election to liquidate by

9   the board of directors and considering that at benchmark periods

10  of time, I have some concern about how that dovetails with the

11  Colorado Corporate Law.  If you -- if this board can be given

12  authority to liquidate as a matter of law without a shareholder

13  vote and if, frankly, I look at the Colorado Corporate Law that

14  closely in a few years, but the issue just occurs to me that --

15  and, perhaps, it something that's dealt with in the articles and

16  permitted by a statute, but I don't know if you're creating a

17  conflict with applicable corporate law or by giving a board the

18  power to liquidate or merge or without shareholder approval under

19  the governing corporate law.

20          And I think we've had evidence, and I expect I'll hear

21  argument, there may be little left to it on the question of the

22  interplay with exhibits and I guess it's 15 and 16 on the voting

23  report and assignment of claims.  And just so you're not feeling

24  that the focus is unfairly going to one side of the courtroom,

25  Mr. Weiss, (inaudible), you might address -- if -- and among your

 1   objections is what's commonly referred to as a best interest

 2   objection, and perhaps if you know, you might address whether

 3   under 1129(a)(7) (ph) does the U.S. Trustee have standing to

 4   raise a best interest objection or does that only belong to

 5   holders of claims who have voted no in a class of creditors?  And

 6   that may be an -- there may be an easy answer to that question

 7   and I, too, will take a look, but I don't know it.

 8           Let's reconvene at 2:00.  We'll plan on winding up by

 9   3:30.  I'll try to be in a position and if I'm able to, and bring

10   your calendars or your Blueberrys (sic) or whatever you bring in

11   these days, and I'm -- it's a Blackberry, I know --

12           MR. JESSOP:  And they have Blueberrys (sic) --

13           UNIDENTIFIED SPEAKER:  Crackberrys (sic) (ph) --

14           THE COURT:  And if the Court is unable to rule this

15   afternoon, we'll find the time in the very near future to where

16   we can, but for that reason if you would bring your calendars,

17   I'd be appreciative.

18           And with that, we will recess until 2:00.

19           THE CLERK:  All rise.  This Court is in recess.

20           (WHEREUPON, recess was taken.)

21           THE COURT:  Please be seated.  Good afternoon.  We are

22   convened again in the Blue Bear Funding case for summation on the

23   pending plan of reorganization that was -- has been proposed by

24   the Creditor's Committee and the debtor in possession.  And a

25   motion seeking approval of a settlement that has been offered by

1    the debtor and the parties to which are certain IFCs and members

2    of the Creditor's Committee, as well as the debtor.

3            Before we begin with final arguments, let me do one

4    housekeeping matter, counsel, to make sure that our record

5    contains the exhibits that you think it does.  And I'll ask you

6    if you could grab your notes in terms of what you think is in and

7    let me go over what my notes reflect.  At the end of the day, we

8    will give you an order that will require that custody of the

9    exhibits by the person who has offered them, and I think that in

10   this case it will all be the debtor in possession, Mr. Jessop,

11   and so you'll be directed to hang onto these exhibits, the

12   originals that are there at the witness stand and you're familiar

13   with the drill until the end of appeals or time for appeals.

14           But let's go through what my notes indicate are in the

15   record before we start with summation.  And that is Exhibit 1, 5

16   through 11, and 15 through 17.  Three exhibits were offered and

17   not admitted and those are 3, 4, and 14.

18           MR. JESSOP:  Your Honor, I believe that 4 was denied

19   admission through Mr. Davis, but was admitted through Ms. White,

20   summary of ballots as amended.

21           THE COURT:  So 4 is -- let me pull -- you say 14.

22           MR. JESSOP:  It's not actually what's been in the

23   notebook as 4.  It's really Ms. White's amended ballot tally as

24   admitted.

25           UNIDENTIFIED SPEAKER:  I thought that was 15.

```
 1              THE COURT:  It is, too.

 2              MR. JESSOP:  Oh, okay.  Then, yeah, that's correct

 3    then.  Right.

 4              THE COURT:  Is that consistent with counsel's

 5    understanding of what we have in the record?  I will take your

 6    silence as yes.  The record -- I mean and the record is what it

 7    is, but I -- what I don't want to have happen is have somebody

 8    assume something is in and then (inaudible) might not get an

 9    objection --

10              MR. JESSOP:  Your Honor, it may have been an oversight

11    then because I think 17 was the series of --

12              THE COURT:  17's in.

13              MR. JESSOP:  17 -- this is --

14              MS. WOLF-SMITH:  (Inaudible) --

15              MR. JESSOP:  Right, right.

16              MR. WEISS:  Right, the one you had originally marked as

17    2 --

18              MR. JESSOP:  Was all the service agreements and then

19    18, I thought, was the actual settlement agreement before

20    settlement --

21              THE COURT:  18 is the actual settlement agreement.  It

22    was never offered.

23              MR. JESSOP:  Oh, I'm sorry.  Is it too late to offer

24    then?

25              THE COURT:  No, I mean it's not much of an issue
```

1   because it's a pleading and we're going to decide on it whether

2   or not it's an exhibit --

3           MR. JESSOP:  Okay.

4           THE COURT:  -- but why don't you offer and unless

5   there's an objection --

6           MR. WEISS:  And I have no objection, Your Honor, since

7   it is a pleading.  The Court could take judicial notice of it.

8           THE COURT:  And it just makes the record tidier if

9   somebody should have the audacity to appeal this Court.  I

10  welcome appeals and I'm totally -- forget the last comment.  Said

11  in jest.

12          Anything else before we begin with final argument?

13  Mr. Jessop, Ms. Wolf-Smith, go right ahead.

14          MR. JESSOP:  Thank you, Your Honor.  I think I started

15  out that it was great to get to this point in this case to be

16  able to offer a plan, a plan that was fought out and negotiated

17  with the creditors, a plan that was overwhelmingly accepted by

18  the creditors.

19          When I got involved in the case, I kind of thought this

20  was a big company because when I looked at the first financial

21  stuff I thought it was a big company, and it turned out it was a

22  company that had a lot of problems.  And I think we heard about a

23  lot of the problems during this case.  It definitely has been

24  pruned and shrunk and restarted.  As the trustee's own pleadings

25  admit, it has had a modest profit during this bankruptcy period,

1   absent the bankrupt -- the cost of bankruptcy.  It is facing the

2   perils of the future, like any other company, but there have been

3   significant changes to reflect the reality of the company and it

4   has survived the harsh bankruptcy environment.

5           The committee has represented all the creditors --

6   unsecured creditors, their co-proponents, and as we said from the

7   very beginning, we did what they wanted us to do.  We told them

8   it was their company.  This will become, upon confirmation, their

9   company.  They will be all but one of the board of directors.

10  They have the reigns.  We give it to them gladly.  We told them

11  we would do it and that's what we've done.

12          The objectors, we have the U.S. Trustee, who's

13  authorized by law to comment on plans, but they have taken that

14  commenting to new levels.  Their basic argument is that the

15  creditors are rubes and bumpkins and don't know better.  Sierra

16  has settled and Mr. Karst and then CFS started out with some

17  arguments, which were not further pursued.

18          The balloting in this case has over 90 percent of the

19  creditors voted to accept this plan.  Two-hundred-and-ninety-four

20  of the 298 unsecured creditors, who voted, voted for this plan,

21  Your Honor.  That's 99 percent in number and 98 percent in dollar

22  amount.  Nine of the 16 impaired classes accepted and the -- I

23  think it's fair to say that the case for the last three days has

24  centered on 1129(a)(11) (ph) feasibility and is -- will the

25  confirmation of the plan not likely to be followed by the

1    liquidation or the need for further financial reorganization of

2    the debtor or any successor to the debtor under the plan, unless

3    such liquidation or reorganization is proposed in the plan.

4              What it really became -- kind of interesting to me, is

5    not an issue of whether the company, Blue Bear, was making money,

6    but how much was it going to make?  I think that there have been

7    targets.  There's no doubt about it that there's going to be some

8    issues that will have to be overcome.  The testimony was that the

9    board had the authority and, as it does under corporate law, to

10   liquidate the company any time and would consider the issue at

11   least quarterly.

12             And Your Honor raised the question are we going to run

13   into corporate law problems?  And I want to address that.  I

14   believe there's an argument that Your Honor could enter an order

15   authorizing that, even under state law.  There is state ordered -

16   - judicial ordered liquidation.  I don't believe that's what we

17   really were contemplating, that your order today was going to do

18   that.  What it does contemplate is we will follow state law and

19   state law requires that we give notice to the shareholders and

20   have a shareholder vote.  The bylaws of the debtor that are

21   attached to the plan provide that we can do that in ten day's

22   notice and that even if we just get 51 percent or a majority of

23   the outstanding, even without a meeting, it can be done.  This is

24   not a process -- we're not a public company; you're going to have

25   to do elaborate proxy and things like that.  This is a process

 1   that can happen very fast if they decide to do it.

 2           THE COURT:  Well, excuse the interruption, but will

 3   that take a modification of the plan to allow -- I mean to make

 4   sure that the plan isn't providing it can be done without some

 5   shareholder vote?

 6           MR. JESSOP:  I don't believe it does, Your Honor,

 7   because the articles that are contemplating you're going to --

 8   we're going to operate pursuant to the act, the bylaws talk about

 9   it, and there's a specific provision that says that you follow --

10   please follow the act in the event of unusual events, like sale

11   of all or substantially all of the assets and/or merger or

12   dissolution.  So, there is a specific section in the bylaws that

13   addresses that.  So, I think -- I don't think it needs

14   modification.  If Your Honor would like us to clarify that

15   somewhere, we'd be pleased to do that.  And I'll make a note, but

16   if that becomes a pivotal issue, Your Honor, or an important

17   issue or any issue because it's Your Honor.  Let us drop all

18   adjectives.  So, it shall be done, sir.

19           The one thing that I did look at, also, is the law on

20   what we mean by feasibility.  And, obviously, I think we've all

21   heard a realistic reasonable assumptions, reasonable prospect of

22   success, and is workable.  And the 10th Circuit BAP (ph) in Inray

23   (ph) Investment Company of the Southwest did talk about the fact

24   that there are unexpected events that may defeat those

25   projections does not make a plan unfeasible as a matter of law or

1    fact.  And I would say that the testimony -- the cross-
2    examination has been a lot of parade of possible bad meteor
3    events that could strike the earth and cause havoc into this
4    company.  It is going to suffer the same kinds of threats of
5    raising money to expand the business, finding customers,
6    satisfying those customers, collecting on accounts receivable.
7    There's not a business out there that doesn't have those problems
8    and that -- I don't believe by demonstrating that over and over,
9    that we've effected the feasibility.

10           The testimony by an expert was that the assumptions to
11   this plan were reasonable and conservative.  And I think the true
12   -- I don't think I've ever seen a more modest plan -- a set of
13   projections.  There's no hockey stick, Your Honor, here.  It is a
14   gradual increase.

15           And if you look at the disclosure statement and looking
16   at the history of the company, Your Honor, with any disclosure
17   statements as an exhibit, the company raised approximately $18
18   million in just a little over a year.  Now, it turns out 7.3
19   million of that was really not a raise, so let's just say 11
20   million in a year.  Now, this plan that contemplates 5 million
21   over five years; I think that is far more modest and a doable
22   projection.  It's reasonable and the testimony was that it was
23   reasonable and Mr. Davis testified that he could he -- he has
24   made the conversations, he's made the contacts.  They've told
25   them there is an appetite for this kind of investment and that

1    money was possible.

2           Now, the other thing that makes this plan particularly

3    feasible is that we don't have very much secured debt.  I believe

4    the testimony was that the current secured debt position -- one

5    lender was at 225 and the other one was at 35.  We have a very

6    small current secured position of debt and all of the unsecured

7    debt is going to be getting -- receiving equity and that's the

8    overwhelming amount of the claims in this case.  They're getting

9    equity.  There's no mandatory defeasement (ph) payment, dividend,

10   anything like that under the plan.  The debtor has control of the

11   finances as far as going downstream payments to creditors.

12          And despite a lot of attempts to -- well, to -- you

13   know, to test and I think it's always appropriate to test

14   assumptions and projections and projections are just what they

15   are.  They're projections.  I think that no one has produced

16   confident evidence of a different number.  There have been

17   attempts to maybe make it a little less and I think, though, that

18   no one has come up with competent evidence on their own that

19   there is a different set of projections that will take place,

20   that there will be a doink (ph) (sic) into the ground.  But even

21   still, the debtor says let's be on the safe side, the

22   conservative side, and if we have to stop doing business, we will

23   stop doing business.  We're not going to burden the world with a

24   business that doesn't work, but we're going to give it a try.

25   And I think the theme of everything I've heard from the creditors

1  is they want to give a company that is not no longer burdened

2  with the fraud and the bad acts before, give it a chance to go

3  forward.

4        Now, one of the big points, I think, is what if Star

5  Rider and Sun Chaser don't pay out on time?  I think the

6  testimony was that that would hurt.  I don't think the testimony

7  was that it would kill the plan or that it would kill the cash

8  flows in a way that game over.  At best, there's a timing and an

9  amount issue.  And the testimony was is that that will -- when

10  you look at the cash flows of a business, you have to look --

11  especially a factoring business, which has a fair degree of

12  volatility, they annualize over the year.

13        The testimony of Ms. Brinkman was that eight per --

14  Sierra had maybe an eight percent interest and the Silver

15  Mountain piece didn't say how much of a piece they had of Sierra

16  or Star Rider at all.  There was no -- nothing in that proof of

17  claim and she is the managing member of Silver Mountain.  And all

18  have avoidable UCCs as described in the disclosure statement.

19        Another issue that was raised, and I think it was an

20  interesting issue, was the taxes -- the issue of whether or not

21  the taxes were in the projections.  And this is probably the

22  first time of any case I've been in where we're fighting about

23  how much tax I'm going to have to pay on my profits.  This is a

24  good problem.  If I've got a problem of we're making profits;

25  it's a good problem.  Yes, it will effect the ramp of growth.  If

1    we have to pay taxes that's going to take that down.  I think

2    that's the -- pretty well known.  No one has told me that it was

3    going to go the other way and go into the ground.  Making --

4    having to pay taxes means you have profits, it means you're in

5    business, it means you're doing the right thing.

6            Now, Mr. Collins, the expert, said that it was his

7    understanding that there would be some NOLs for some period of

8    time, that the issue was very complex.  And that is about as deep

9    as we got into the impact of the taxes on the projections.

10           Now, it was also clear from the testimony, I hope, that

11   there were no -- the projections did not take into account

12   litigation recoveries.  They're not in those projections and

13   that's another source of recovery.  And the testimony was is that

14   there was 3.8 million of avoidance actions, $900,000 of bad debt

15   liquidation, and those were the estimates of recoveries.

16           We, also, all know that most cases settle, except for

17   this one, and that there will be a stream of supplemental income

18   coming in to this debtor from its collection activities.  But

19   that was all part of the vision of the plan, Your Honor, was to

20   get this company righted, get it back into the business of

21   factoring, take the litigation, put a fund with -- from the IFCs

22   to help support that litigation, get that stuff done, and then

23   have the extra income and the extra -- that it will either grow

24   or be distributed, depending on the timing of that.

25           I think we always have to look at the best interest of

1   creditors.  We did have rejecting creditors and we are required

2   to say we believe that this plan gives a creditor more than they

3   would receive in a liquidation.  Both the disclosure statement, I

4   believe, had Exhibit G and Exhibit H that discussed both the

5   liquidation of what we projected.  It was around 1.7 cents on the

6   dollar on the best side and worse case nothing under Chapter 7.

7           And the disclosure statement also discussed the present

8   discounted value of the interest in this company over time coming

9   down to today around 13.5 cents a dollar.  And I think I

10  recognize that the projections are related to the valuation of

11  the company and present discounted value of the company, but

12  there have been no testimony that even with some of the problems

13  that were pointed out that we're going to go all the way down to

14  1.7 cents or lower.  The evidence that has been available is that

15  it's 13.5 and maybe it's been less from some of the points that

16  were made, but no one has given us a figure that says it is less

17  than the amount that we believe would happen in a liquidation.

18          And I think it's important that the feasibility test is

19  really kind of one of reasonableness and there hasn't just been

20  an expert eyes on it, the unsecured Creditor's Committee's eyes

21  on it and the debtor looking at it, but there were 300-some

22  creditors who voted to accept this plan.  And they all reviewed

23  what would have to be characterized as a highly detailed

24  disclosure statement, which was full of both the risks and the

25  projections.  And I think that based on that, the Court has the

1   discretion and I believe can easily find that this case was -- is

2   feasible.

3          To go through a quick checklist, Your Honor, I know I

4   don't have a lot of time, but 1129(a)(1) (ph) requires -- I'm

5   going to go through a checklist and I would also refer to the

6   brief that we've tendered to the Court, Your Honor.  But

7   1129(a)(1), we've met the applicable provisions.  Generally,

8   that's understood.

9          To take a look at 1122, the classification

10  requirements, and 1123, the mandatory and the permissive sections

11  of the code.  We had an objection.  I think that's stood on

12  classification brought by Sierra.  We've resolved that, Your

13  Honor, and I think that it does -- and mostly they were talking

14  about how the -- that they felt that they were secured,

15  unsecured, or perhaps an owner, and we have reached a settlement

16  on the language to add to that.  And we did exactly what I think

17  has to happen is that each secured -- alleged secured creditor,

18  who filed a proof of claim with same unsecured, got put into its

19  own class with -- and the plan provides, obviously, that if

20  there's an unsecured portion that's treated like its own

21  unsecured class.

22         1123 talks about the mandatory requirements that we

23  must designate classes of claims and interest.  That's in the

24  plan.  Specify what your impaired and unimpaired.  Specify the

25  treatment.  The interest that -- what happens to a holder if they

1   go differently on the plan.  We prohibit non-voting equity and we

2   provide adequate means for the plan's implementation under

3   Article 7.  There is a conversion from an LLC to a C corp.  There

4   is a vesting of assets and reorganized Blue Bear.  There is an

5   issuance of common stock, the cancellation of prior interest, and

6   adoption of corporate documents, the bylaws and the articles of

7   incorporation.

8        1129(a)(2) suggests -- requires that we comply with the

9   applicable provisions of Chapter 11 and that's generally

10  understood about solicitation procedures.  I mean there was in

11  this case, Your Honor, and you can judicial notice of the order

12  on solicitation procedures that also approve the form of the

13  ballots.  There was -- that order was followed.  There was a

14  certificate of service filed with this Court that stated that the

15  solicitation package went out on June 30th.  There was also an

16  exhibit, Your Honor, the amended fair fight summary of ballots,

17  which then summarized the ballots that were received.

18       Now, 1129(a)(3) requires that the plan be proposed in

19  good faith and not by means forbidden by law.  That is not a

20  provision that deals with moral taint or fraud or things like

21  that.  It's really talking about is there a reasonable likelihood

22  that the plan will achieve result consistent with the objectives

23  and purposes of the bankruptcy code?  And the testimony was that

24  we did it this way because we thought there was a better return

25  to creditors, especially a return that was responsive to the

1   request.  This is not a case where we're just doing this for some

2   sort of tax planning to avoid certain harm to a limited class of

3   equity interests.  And, in fact, although Mr. Decklan O'Donnel

4   (ph) was not a witness, he certainly seemed to reveal that he had

5   wished there had been a plan that specifically protected his

6   clients who were owners of Blue Bear and soon not to be owners of

7   Blue Bear.  This is not -- that would have been a bad faith plan.

8   This is not a bad faith plan.

9        There was also an attempt, and I think it's important

10  to note it, that a suggestion that maybe Mr. Davis knew all about

11  the $900,000 transfer in March of 2005 from Blue Bear to Sierra

12  and the money that came in and the confusion around that.  And I

13  believe his testimony was he did not know about that.  He wasn't

14  sure of the exact date, but it wasn't until the end of March.

15       Now, pay -- 1129(a)(4), payments for services are

16  disclosed and reasonable or to be fixed by the court after

17  confirmation and that's precisely -- our plan provides that

18  professional fees are subject to reasonableness by the court and

19  allowed administrative claims can be paid.

20       1129(a)(5) requires the disclosure of post-confirmation

21  directors, officers, voting trustees, and insiders.  That has

22  been disclosed.  We -- at the very beginning we announced that

23  the Creditor's Committee would become the board of directors,

24  along with Mr. John Davis.  And we also disclosed that Mr. Davis

25  would be the CEO.

1        With respect to 1129(a)(6), there was testimony that no

2  regulatory approval was necessary.

3        1129(a)(7), the best interest test that a non-accepting

4  class must receive not less than the liquidation value of the

5  claim or interest.  Again, as I've discussed these earlier,

6  Exhibits G and H of the disclosure statement and, as discussed,

7  lay that out.

8        1129(a)(9), priority claims are to be paid properly.

9  The testimony was that there would be sufficient cash on hand on

10  the effective date of the plan to cover the relatively small

11  amount of administrative claims that would be allowable at that

12  time.  And there was a change to that provision, Article 3,

13  Section A that was modified.  I read it into the record, Your

14  Honor, but I've also -- we've also put it into a modified --

15  modification of the plan.  I've redlined the version of the plan

16  and if I could give you that, Your Honor?  May I approach?

17        THE COURT:  Yes.  Thank you.

18        MR. JESSOP:  Here you go.

19        And just to catch us up, Your Honor.  Page eight of the

20  redlined version that I just gave you, Your Honor, shows the

21  changes that were part of the Sierra Factoring stipulation

22  settlement.  Page 11 shows the change of Jessop & Company that we

23  have talked about.  And I actually -- maybe it works for myself.

24  We actually leave the debtor with a reserve at least -- we don't

25  take them -- the debtor down to zero.  We leave them a $10,000

1    reserve.

2              (Pause.)

3          MR. JESSOP:  With respect to 1129(a)(10), at least one

4    impaired class is accepted without the vote of insiders.  Yes, we

5    had impaired classes accept.

6          1129(a)(11), the feasibility requirement I've already

7    talked about.  We, so far, have unrebutted expert testimony.

8    Projections were reasonable and conservative.  And just an

9    example, I recall that the bad debt reserves, while the industry

10   seemed to suggest that five percent was reasonable, Blue Bear

11   actually chose to use seven percent and that took itself a little

12   further, gave it more cushion.  And certainly Mr. Collins

13   testified that the assumptions were within the range of

14   reasonableness.

15         1129(a)(12) provides that basically all fees payable to

16   the U.S. Trustee and the Court must be paid or provided in the

17   plan on the effective date of the plan and that's provided in

18   Articles 3A as an administrative -- talking about administrative

19   claim, but more clearly and directly in Article 8A.

20         1129(a)(13) deals with retiree benefits, which are not

21   applicable.

22         Now, with respect to the classes that rejected, who are

23   potentially secured creditors, Your Honor, we modified on page 12

24   and 13, Article 5, Section A and Section C and this goes to a

25   concern that was raised originally by Sierra.  We are trying to

1   make it clear that the eight-and-a-half percent per annum is

2   calculated from the effective date, just in case that wasn't

3   clear.  So, both treatments of classes 3, A, B, C, and D and

4   class 4A through 4I are clarified in that way, Your Honor.  With

5   respect to the unsecured creditors, no class junior to that class

6   receives anything.

7           I think I've addressed two of your questions.  I think

8   the third one, Your Honor, was the interplay of the voting report

9   and the assignment of claims.  I think I might have mentioned in

10  court the order that was entered by this Court approving the

11  adequacy of the disclosure statement and solicitation procedures

12  sets the record date as June 23rd, 2007.  The testimony by Mr. --

13  oops, 2006, sorry.  Thank you.  Testimony -- boy, would that be

14  bad.  Testimony was -- by Mr. Miller was that the letter that was

15  signed on July 14 and that a meeting that did discuss this was

16  held on July 18.

17          Now, I think you asked a fourth question and if I may

18  jump in a little bit about the U.S. Trustee's standing?  Our

19  quick review of the cases suggest that that's kind of split.

20  Taking a look at U -- 28 USC Section 586 suggests that the

21  trustee -- U.S. Trustee is authorized to monitor the plan and

22  disclosure statement filed in cases under Chapter 11 and then

23  give comments with respect to such plans under 1128.  And,

24  apparently, the debate is what do they mean by comments?  Do they

25  mean wholesale warfare or do they mean some sort of comments

1   about -- general comments.  And I'm sorry, but I guess this is

2   why you get to wear the robe.

3          I certainly would argue that the role of the trustee

4   has been both exemplary, attentive, and over the top.  So, I

5   would say that I we -- well, especially when we have a Creditor's

6   Committee represented by competent counsel and even an --

7   unofficial committee also represented by competent counsel, all

8   whom have varying interests in this case.  I think it's received

9   a lot of attention.

10         In closing, Your Honor, it's a little company.  It's

11  not a big company.  We're having battles over whether how

12  profitable it will be, not whether it's going to be profitable.

13  Its creditors want to give it a chance.  It's overcome enormous

14  hurdles and I think it has a reasonable chance and I think the

15  evidence shows that.

16         THE COURT:  Thank you.  How would you like to proceed

17  in terms of the Creditor's Committee?  Do you want to speak at

18  this point, Ms. Wolf-Smith or --

19         MR. JESSOP:  We had -- what we thought we would do is,

20  Your Honor, we have 45 minutes.  I want to reserve five for

21  rebuttal and I think I took maybe 20 minutes or something like

22  that, 25.

23         MR. WEISS:  (Inaudible).

24         MR. JESSOP:  How much?

25         MR. WEISS:  (Inaudible) those words.

1          MR. JESSOP:  I know and I was going to ask, but anyway
2     I think I -- I tried to go through.

3          MS. WOLF-SMITH:  It's fine.

4          MR. JESSOP:  So a few minutes for Ms. --

5          MS. WOLF-SMITH:  (Inaudible) give me ten.

6          MR. JESSOP:  -- Wolf-Smith and a few moments for Mr.
7     Young.

8          THE COURT:  Very good.

9          MR. JESSOP:  Thank you, Your Honor.  And then --

10         MS. WOLF-SMITH:  Well, I'd like to start out by saying
11    I'm sorry Mr. Miller isn't here to hear this part of my closing.
12    I think Mr. Jessop has been very kind in saying that the U.S.
13    Trustee's position has been over the top.  I think the position
14    of the U.S. Trustee in this case has been extraordinary.  Before
15    us we have a plan, which the committee not only supported, but of
16    which the committee of co-proponent.  But the members of the
17    committee have volunteered hours and hours and hours of time.
18    And as Mr. Miller testified, they have looked at all of the
19    issues in this case and reviewed them and analyzed them and made
20    decisions about them.

21         The U.S. Trustee has taken the position in this case,
22    which is antagonistic to the -- everything that the committee has
23    reviewed and considered and addressed.  And this plan represents
24    the exercise of the committee's business judgment and also the
25    exercise of its fiduciary duty to creditors.  As Mr. Miller

 1   testified, the committee members were aware and he was aware that

 2   the -- their job was to do what was in the best interest of

 3   creditors.  I haven't heard any evidence presented to support the

 4   U.S. Trustee's antagonism to this plan and that the extreme

 5   position taken by the U.S. Trustee's office.  I have not heard

 6   any evidence, which shows me that there's post-petition fraud in

 7   this case.  To the contrary, I think all of the evidence that we

 8   have heard goes to the fact that this company has tried to clean

 9   up the past wrongs that have been committed on creditors.

10        The trustee's main complaint, and I think its only

11   complaint, is that this business is small and that it may not

12   succeed and that's the only complaint that I've heard today and

13   yesterday and the day before.  The possibility of this company

14   not succeeding is built into the plan.

15        The investors and the committee have been told in the

16   disclosure statement that this company may not succeed and the

17   projections are clearly built on assumptions and that's made

18   clear in the disclosure statement.  The creditors and the

19   committee have understood that the company may not succeed and

20   they've exercised their business judgment to allow the company to

21   continue, to monitor its progress, and they reserve the right to

22   shut down the business if the business is not prosperous.

23        As an aside, Mr. Miller also testified that the company

24   -- that the committee exercised its business judgment and

25   determined that a shut down after confirmation of the plan would

1   be better than in a Chapter 7 situation.  I would argue that this

2   plan is inherently feasible because it does not promise success.

3   It doesn't promise a specific pay out to creditors.  It does not

4   promise a specific dollar amount to be paid to creditors on a

5   specific date.  All that it promises is a structure for the

6   continuation of the business until the board decides that the

7   company should not continue.

8          And, interestingly, independently of each other, we

9   both found the same case, Investment Company of Southwest, I

10  think, because it's the most recent case on the feasibility issue

11  in the 10th Circuit and I'll give you a cite to it.  It's 341 BR

12  298.  Again, a (inaudible) decision in the 10th Circuit.  That

13  case starts out by citing the leading 10th Circuit authority on

14  the feasibility requirement and it says that the feasibility

15  requirement is preventing the confirmation of visionary schemes,

16  which promise creditors and equity security holders more under a

17  proposed plan that the debtor can possibly obtain after

18  confirmation.  And I think that we've said all through this case

19  that this is not a visionary scheme and we are not promising

20  creditors something that the debtor can't possibly obtain.  We're

21  not promising creditors anything other than an equity interest in

22  the company.

23         The case goes on to talk about the fact situation in

24  this particular case was that the debtor had promised, under its

25  plan, to pay -- make two balloon payments.  The first one was a

1   $500,000 payment in year five of the plan and the second one was

2   that $730,000 payment in year seven of the plan, but the court

3   said when determining whether a plan is feasible, Court's often

4   consider a debtor's cash flow projections showing its ability to

5   simultaneously make plan payments and fund projected operations.

6   While courts often do not require projections for the same period

7   over which a long-term plan spans, a debtor must still sustain

8   its burden to somehow prove that it will be able to perform all

9   obligations it is assuming under the plan.

10          The point I'm trying to make when I read from this case

11  is that the obligations that this debtor is assuming under this

12  plan can be performed.  It's not promising to make specific

13  payments, as in this case.  There are no specific balloon

14  payments or other kinds of payments that are promised.  It's just

15  promising a stock interest to creditors, which may or may not

16  ever produce dollars.

17          Secondly, Your Honor, I would argue that the business

18  projections are reasonable and feasible.  Mr. Collins testified

19  that the single biggest factor in the success of this business is

20  the amount of money available to use in the factoring business.

21  Mr. Davis testified that he has not searched for dollars because

22  he did not believe it would be appropriate to do that until the

23  plan was confirmed.  But he also testified that he is aware of

24  existing investors, and he named specifically the Clayton's and

25  others who have indicated to him, and he believes that they will

1    invest once the plan is confirmed.

2           Again, Your Honor, the committee and the creditors have

3    made a decision.  They are the stakeholders in this case.  their

4    decision is more fully informed than the U.S. Trustee's decision.

5    They have received and considered much more information in this

6    case, much more detailed information on a regular basis than the

7    U.S. Trustee's Office has received.

8           Whether this business is too small to continue is a

9    business judgment decision.  They have decided that Chapter 11

10   and plan that's presented and continuation of the business, even

11   though it's a small business, is a better alternative than

12   conversion of this case to a Chapter 7 case.  And Mr. Miller

13   testified about some of the reasons for that decision.  He

14   indicated that he thought the collection results would be better

15   in Chapter 11.  He also claimed that he thought that there would

16   be no new set of professionals that the debtor would have to pay

17   to educate or the estate would have to pay to educate.

18          And we have returned many times to the issue of what

19   would happen if we didn't settle with the IFCs as proposed?  And

20   I think Your Honor has noted in previous hearings that we

21   believe, and I think Your Honor has commented on this, that a

22   chaos of litigation would follow.  The IFCs would sue each other

23   and the insiders of the debtor over who owns what, who did what,

24   and we believe that there wouldn't be much money left.

25          We believe that the settlement with the IFCs, as

1    explained in the plan, to fund litigation is a streamline effort,

2    a coordinated effort to get the best results for creditors and

3    that that will be last if the plan isn't confirmed.

4         And I'd like to just speak briefly about the tax issue,

5    which I think was raised in questioning by the opponents to the

6    plan.  I think the objection was that the tax expenses were not

7    included in the projections.  Mr. Weiss and Mr. O'Donnell both

8    engaged in kind of a line of questioning which suggested that tax

9    expenses would be incurred by this debtor and that's because the

10   debtor would not be able to use its NOLs or its bad debt write-

11   offs or possibly NOL carry-forwards.  I'd like to remind the

12   Court that neither Mr. Weiss nor Mr. O'Donnell is a tax lawyer or

13   a tax accountant and they did not put on their own witnesses and

14   they did -- certainly did not put on a tax expert.  And I would

15   submit that they are wrong, but it's clear that they did not put

16   on any expert witness to support their implied conclusions.

17        What we did hear from Mr. Collins, who was the one

18   witness that addressed this issue.  He testified that he's not a

19   tax accountant and could not address the issue himself.  But he

20   also testified that he spoke to his partner, who was a tax

21   accountant, about this question, that she had looked at the

22   question.  And that she felt fairly confident that the debtor

23   would not have a tax liability for many years, and that's why he

24   didn't include tax expenses in the projections.  And he also

25   testified that Sample and Bailey prepared the debtor's tax

 1  returns.

 2          Your Honor, with respect to the Sun Rider -- Star Ride

 3  -- Sun Chaser Star Rider amount that's supposed to come in in

 4  January of 2007, I would ask the Court to take judicial notice of

 5  its own record on that matter.  In the motion for relief from

 6  stay that Silver Mountain filed and the response thereto, it

 7  admitted that even though it claimed an ownership interest in

 8  those accounts, that ownership interest was based on an avoidable

 9  UCC1 filing.  And based on that, we believe that's an easy issue

10  that can be disposed of on a motion for summary judgment.

11          In conclusion, the creditors have not asked the U.S.

12  Trustee to protect them in this case.  They have, instead, made

13  their own choices.  Their decisions are rationale and reasonable

14  and I believe that the Court should confirm the plan because it

15  is a workable plan and it does have a reasonable prospect of

16  success.

17          THE COURT:  Thank you.  Mr. Young?

18          MR. YOUNG:  Thank you, Judge.  I won't belabor the plan

19  yet; other than to say the IFCs fully support confirmation of the

20  plan.

21          In regard to the settlement, Your Honor, and I've gone

22  into this in more detail in my response to the U.S. Trustee's

23  objection, but I believe the settlement meets all the

24  requirements and standards set forth in the 10th Circuit's

25  decision in -- or the BAP decision in Compex (ph), a realty

1    venture, 213 BR 1020.  And those standards are met by the simple

2    fact that the IFCs are transferring substantially all of their

3    assets to the debtor in settlement -- under the settlement.  And

4    that simple fact resolves the four standards set forth in Compex

5    Realty.

6           Briefly, Your Honor, the choices faced by the IFCs were

7    the three I enumerated with Mr. Davis in his testimony.  And it

8    was either to transfer the monies they have to the debtor, return

9    the money to their investors, or sit on the money and wait to see

10   how the litigation ends up.  All the IFCs ever wanted to do in

11   this case was to transfer that money in accordance with the

12   wishes of their investors.  The IFCs wanted the assurances that

13   this bankruptcy proceeding provides that notice would be provided

14   to all the investors once the decision was made what to do with

15   the money.  The decision was made based on input from the

16   investors that what the investors wanted to do with this money

17   was to give it to the debtor to fund the business and the other

18   items set forth in the plan.

19          The settlement went out on notice to all the investors.

20   Not one of the investors has objected and, as far as I know and

21   based on Mr. Davis's testimony, all the investors fully support

22   the decision to transfer these monies to the debtor pursuant to

23   the terms of the settlement agreement.

24          In a situation such as this, Your Honor, I really see

25   no foundation or support for the trustee's objection to the

1  settlement.  Once this is -- once the decision has been made by

2  the stakeholders, such as it has in this case, where the monies

3  have been transferred pursuant to a -- or will be transferred if

4  the settlement is approved, pursuant to an agreement that went

5  out on notice to all the stakeholders, and not one has objected,

6  and the evidence before this Court is that the investors fully

7  support the decision to transfer the money to the debtor.

8          THE COURT:  Thank you, Mr. Young.  Mr. Weiss?

9          MR. WEISS:  Thank you, Your Honor.  If I may deal with

10  the standing issue first?  I think it's a very simple issue and

11  that the proponents and the IFC have looked at the wrong statute.

12  The correct statute to look at is the 11 USC 307 United States

13  Trustee Standing, which reads, "United States trustee may raise

14  and may appear and be heard on any issue in any case or

15  proceeding under this title, but may not file a plan pursuant to

16  1121(c) of this title."

17          Well, this is an issue in a case.  How much clearer

18  could it be?  1129 --

19          THE COURT:  I mean is it an issue for only those people

20  who have voted no on the plan?

21          MR. WEISS:  Not at all.

22          THE COURT:  Or are you their proxy as --

23          MR. WEISS:  Not at all.  1129(a)(7) --

24          THE COURT:  Right.

25          MR. WEISS:  -- reads, "With respect to each impaired

1    class of claims or interest," and everybody admits there are

2    impaired classes, "each holder of a claim or interest either has

3    accepted the plan," clearly we have rejecting holders of claims,

4    so we go to paragraph two, "will receive or retain under the plan

5    on account of such claim or interest property of a value as of

6    the effective date of the plan that is not less than the amount

7    that such holder would so receive or retain if the debtor were

8    liquidated under Chapter 7 of this title."  On such date, that is

9    not the same kind --

10        THE COURT:  My question is is it such holder only who

11   can make this objection?

12        MR. WEISS:  No and the fact that it does not say holder

13   is dispositive.  If one looks at Chapter 13 as an example, it

14   says if a creditor objects in several provisions dealing with

15   confirmation.  It talks about if a secured creditor protests,

16   then it must be treated in a particular manner.  There is no

17   similar language here.

18        THE COURT:  So, would it be your position that a

19   creditor from another class or, perhaps, even a shareholder, an

20   equity interest holder would have standing to assert an objection

21   to the plan because of the best interest --

22        MR. WEISS:  Correct.

23        THE COURT:  -- test?

24        MR. WEISS:  And what's more is that's exactly what the

25   Supreme Court opinion in Toy v. Radloff (ph) implies.  In that

1   discussion of whether you can have a non-business individual

2   Chapter 11, one of the arguments that was made is 1129(a)(7) will

3   be violated repetitively in these cases.  Majority opinion says,

4   well, that's baloney because in order to violate 1129(a)(7) every

5   creditor, every holder has to vote in favor of that treatment,

6   which is less favorable in order for 1129 not to require going to

7   paragraph two.

8        The justices say if everybody does not vote in favor

9   and the plan treats them -- the creditors less favorably, that

10  the court can't confirm that plan and, therefore, that argument

11  was facetious in Toy v. Radloff.  What better authority does the

12  Court need than the Supreme Court to say it takes a positive vote

13  for a creditor to wave the right to receive less than they're

14  entitled to and that that vote, in order to avoid getting to

15  paragraph two, has to unanimous.

16       THE COURT:  And what is the citation on that?

17       MR. WEISS:  I don't have it in front of me, Your Honor.

18  I, unfortunately, left that on my desk and I apologize to the

19  Court.

20       MR. DAVIS:  Your Honor, I have it.  It's at 111 Supreme

21  Court Reporter 2197 1991 decision.

22       THE COURT:  Thank you.

23       MR. WEISS:  There are a myriad of provisions in the

24  code, which specifically say if a creditor, if a holder, if the

25  standing trustee.  This doesn't have -- 1129(a)(7) doesn't have

1   that kind of qualifying language.  It just doesn't.

2            307 gives general standing to raise any issue in any

3   case.  It's intended to be extraordinarily broad.  The U.S.

4   Trustee's standing is intended to be there when nobody else has

5   an incentive to be here.  We are the watchdog for the system, for

6   the creditor who hasn't voted, or who hasn't made the decision

7   that it's worth his or her while to appear.  This is an extremely

8   expensive process.  To say that only that the (inaudible)

9   creditor would have standing would effectively deny that creditor

10  their day in court.  It's the U.S. Trustee's role to bring any

11  issue before the court when there really is nobody else that can

12  afford to or has the incentive to.  It's the -- it's not a

13  difficult issue, Your Honor.

14           My opening argument I alluded to an opinion by Judge

15  Labin (ph), District of Massachusetts.  I will read the quote to

16  which I alluded.  "Bankruptcy is perceived as a haven for

17  wistfulness and the optimistic of (inaudible).  The atmosphere is

18  conducive to fantasy and miraculous dreams of Phoenix rising from

19  the ruins.  Unfortunately, this court is not held during the full

20  moon and while the rays of sunshine sometimes bringing the

21  warming rays of the sun, they more often bring the bright light,

22  that which makes transparent and evaporates that -- and

23  evaporates the elaborate financial fantasies constructed of

24  nothing more than the gosper (ph) and the sophisticated tax

25  ledger to make."  That's from Enray Maxim Industries, 22BR 611 at

1   page 613, Bankruptcy Court for the District of Massachusetts,

2   1982.

3           Judge Lavin was sua sponte raising the feasibility

4   issue, even though everybody had voted in favor of that plan, and

5   he denied confirmation and he denied reconsideration.  It's the

6   court's role to look at these issues and not to defer to the

7   creditors.  The court has an independent duty to make sure

8   visionary plans are not confirmed.

9           Yes, there are huge feasibility problems.  We're less

10  than a month away from a need for $150,000.  We have a vague

11  commitment from the Clayton's to let their line of credit, which

12  is a secured line of credit not contemplated by the projections,

13  to use their money to meet that need.  Well, where is the next

14  $150,000?  We have a million and a -- 1.1 million in receivable

15  that's due in January.  Ms. Wolf-Smith and Mr. Jessop will say,

16  hey, that's an easy case.  We can win on summary judgment.  The

17  Court's fully aware summary judgment motions seldom succeed and

18  even when they do, they take months to get to the point where

19  they're right for decision, typically.  Even an easy summary

20  judgment can take months to get to the point of rightness.  That

21  is not very likely.

22          The projections show the debtor needs a constant

23  infusion of new money, millions of dollars of new money.  Mr.

24  Collins testified quite clearly to that.  And that that money is

25  not likely to be available from a bank for years.  Mr. Davis, in

his testimony, indicated it wouldn't be available from a bank in

his estimation until at least 2009. Why do these investors want

to invest the money? Well, Mr. Collins said, well, gee, because

he think -- and Mr. Miller say, well, they -- they're looking for

some sort of fixed rate of return on investment and I have this

moral obligation. Let me tell you, there's no evidence that

they're not going to run out of those kinds of lenders. There's

a limited pool. Interest rates are rising. There are other

fixed interests, fixed income, investments out there. The yields

rising on them as the market goes up.

It is absolutely facetious to believe that that's going

to be a good funding source for any amount of time at all.

They're lucky if they get through the end of the year with such a

lending source.

The testimony is that projections do not project

sporadic irregular needs for cash, yet the debtor has such

irregular sporadic needs for cash. Testimony is that the debtor

can't fund accounts and it's likely to lose customers or at least

it's likely to lose the opportunity to make the money off of the

accounts they can't afford to factor.

Mr. Jessop has said, well, under his modification to

the plan, he's going to leave the debtor $10,000 to work with

over and above what his firm is going to collect. Let me tell

you, that's a huge albatross around this debtor's neck on a

constant basis until he's paid off. Tell me that doesn't create

1  an almost insurmountable cash flow problem when the debtor can be

2  assured of maybe only having $10,000 in the bank.

3      The debtor's had declining revenues during the year

4  that it's been in bankruptcy.  It's own projection show that.

5  It's got less clients now than it did when it came in.  Mr.

6  Davis's testimony establishes that.  Its cut back on its staff

7  and Mr. Davis testified they're very busy and they have very

8  little time to do marketing.

9      There's six other factors in the northern Colorado

10  market.  There's banks.  There's other financial institutions.

11  There's lots of competition.  Mr. Davis has testified there are

12  very limited opportunities.  That there are restrictions due to

13  geography because you have to have a hand's on approach to these

14  customers, yet more demands on his time and the other salesmen's

15  time, time they don't have to do much marketing, much less much

16  client maintenance.  This debtor has virtually no chance of

17  increasing its clientele under its existing projections.

18      If one looks at the May and June 2006 projections

19  versus the 2006 May and June actual performance, their actual

20  performance was less than half of what had been projected.  That

21  scarcely bodes well for the viability of this business or the

22  validity of the projections, as conservative as they supposedly

23  are.  There's continuing negative publicity about this company.

24  Mr. Davis testified that it's in the papers regularly.  Well, if

25  you have a choice between a company with taint and a company that

1    has no taint, for years to come one has to guess the taint will

2    be there.  Mr. Davis testified that himself.

3         The tax burden.  Ms. Wolf-Smith mischaracterizes Mr.

4    Collins' testimony.  He said he spoke with his tax partner and

5    his tax partner said there would be some tax benefits for a while

6    that would likely shield them from taxation for a while.  That

7    was about as specific as he was.  Not for the length of the plan,

8    not for a year, just for a while.  That's what the testimony was.

9    Does that mean three months, three years, 30 years?  Who knows.

10   That testimony isn't part of the record.

11        The projections mix cash and accrual accounting.  By

12   their very basis, a lot of the numbers were inconsistent with one

13   another because they don't have a consistent basis for the

14   projections.  Projections project a constant cost of money when

15   everybody admits there isn't likely to be a fixed cost of money

16   over the life of the plan.

17        The benchmarks that are contained in the plan are just

18   benchmarks.  They're meaningless.

19        The feasibility, Subsection 1129 -- 1129(a)(11) talks

20   about you either got to show the court that you have a reasonably

21   good chance of completing your plan and not coming back or if the

22   plan contemplates liquidation that that is going to happen.

23   Well, what does that second part mean?  It means that the plan

24   has to provide -- and the case law cited by Mr. Jessop shows

25   this, the plan has to say if X happens, we liquidate.  There has

1    to be a trigger, not a benchmark.  This is benchmark.

2          We have no evidence, other than about Sierra and its

3    related company, Silver Mountain, about who the defendants are or

4    how viable they may be.  We have no discussion of validity of

5    these claims.  The Court knows nothing, absolutely nothing, about

6    any of these claims on the record presented.  That's because the

7    debtor has stood on privilege.  It has the right to do that, but

8    there are consequences to that.  One of the consequences is

9    you've got to live with the fact that you haven't proven a thing

10   and they haven't proven a thing.

11         The evidence is there are criminal investigations by

12   the FBI.  Under 18 USC Section 3613, a conviction creates a lien

13   on all of the property of the defendant other than that property,

14   which would be exempt from execution on a tax lien.  And I

15   provided the Court with a copy of that statute.  Under 18 USC

16   Section 3616(e) (ph), that lien is not avoidable in bankruptcy,

17   perfected or not, it's not avoidable.  Preferential or not, it's

18   not avoidable by the specific provisions of 3613(e).

19         We have no evidence that all of these defendants aren't

20   going to either prove and not to have resources or to file

21   bankruptcy or to have perfectly good defenses.  We had no

22   evidence of anything that suggests this litigation is at all

23   viable.

24         We have assignments of the individual claims, Exhibit

25   16.  The evidence shows that those assignments are almost

certainly voidable, if not outright void.  The creditors, the
investors got insufficient notice.  They weren't advised to seek
independent legal advice.  They were not given an appropriate
amount of disclosure and, arguably under the Enray (ph)
(inaudible) and Limousine series of cases, it was an improper
solicitation under 1125.  But if one concentrates only on the
notice given to these folks, I wouldn't want to be the attorney
relying on those assignments.  It doesn't have the language with
the appropriate advisements.  The description the letter suggests
-- the letter didn't give them appropriate advisements.  We have
absolutely no idea whether these folks have any validity to those
assignments whatsoever.  So, under the extent the debtor and the
committee rely on those assignments, that reliance is completely
misplaced.

         The best claims are most likely investor claims.
Investors can go file a class action suit.  They don't need
bankruptcy to do that.  Even a couple of investors or they're
motivated to bring claims can beat the debtor and the committee
to the courthouse conceivably, deplete whatever pots there are to
deplete.  We have no evidence whether the creditors who haven't
done those assignments are on their way to the courthouse or not
or whether they're showing any signs of pursuing litigation.  We
have no evidence that the alternative non-bankruptcy methodology
to pursue the litigation wouldn't be just as successful, just as
lucrative, and, therefore, better for the creditors than a

1   bankruptcy solution, which is encumbered by all of the problems

2   of this case.

3           The hedged investment opinions from the 10th Circuit,

4   the Phillip's opinion from the Colorado Supreme Court both favor

5   stripping defenses away from companies that have engaged in

6   fraudulent acts.  There's no question but that the IFCs and Blue

7   Bear did.  There's also no question -- Mr. Davis testified, Mr.

8   Miller testified, the money that's part of the settlement is the

9   investor's money, yet the evidence is absolutely clear that there

10  is nothing which advised the investors when they got notice of

11  the settlement that one of the options that had been considered

12  and rejected was simply giving them the money back.  It is their

13  money.  I think Mr. Davis and Mr. Miller were absolutely correct.

14  In liquidation, my guess is a Chapter 7 trustee would give them

15  their money up front quickly, rather than a pig in the pole is

16  what they're getting under the plan.

17          There's an argument that the invoices would be hard to

18  liquidate by a Chapter 7 trustee.  Well, Mr. Davis has testified

19  there's interest by third parties to buy these accounts.  Banks

20  will buy these accounts.  Perhaps other factoring companies will

21  buy these accounts.  (Inaudible) would simply sell this business

22  is a going concern or sell the accounts, wanting to collect them

23  himself or herself, would likely simply sell the business off and

24  get some money quickly for the business, rather than pursue

25  what's likely the proverbial leaky dingy trying to pull the

1  aircraft carrier.

2          (Pause.)

3          MR. WEISS:  The payments under this plan are highly

4  speculative.  There's absolutely no guarantee they're going to

5  get a nickel from anything, from any time.  The court in Enray

6  Rusty Jones (ph) dealt with the issuance of stock under a plan

7  and in that opinion the creditors were going to get ten percent

8  of the stock in the company.  With that ten percent they had a

9  virtual assurance of getting $50,000 because the deal under which

10  the $50,000 that would be paid had already happened.  For those

11  $50,000 essentially in the bank that they would get out of the

12  plan.  The court found that's exactly what the stock was worth,

13  $50,000 because they had no guarantee of getting anything out of

14  this eliquid (ph) stock now or in the future, that the future

15  prospects were worthless.  I think that's what the investors are

16  getting in this stock is something that the Court reasonably has

17  to value today as having no value.  The Court's information,

18  Rusty Jones 110 BR 362 (ph), the Bankruptcy Court for the

19  Northern District of Illinois, 1990.

20          What then is the debtor promising?  The answer is

21  nothing.  Nothing but more time, more money being spent to try

22  and address the fraud that everybody agrees was there, more fine

23  hopes, fine dreams, the proverbial gossamer wings that Judge

24  Lavin spoke with.  There is no reality to this plan.  It's not

25  feasible.  It promises nothing in reality and it probably

1   delivers nothing, even if it's confirmed.  It is a hollow shell

2   and the dingy that the Court is asked to allow to continue is the

3   good ship lolly pop.

4         We would ask the Court not to confirm this plan, not to

5   approve the settlement, and to allow us to argue that a

6   conversion of this case promptly is the most appropriate remedy.

7         THE COURT:  Thank you, Mr. Weiss.  Follow-up from the

8   debtor, from the proponents?

9         MR. JESSOP:  Thank you, Your Honor.  Never have the

10  gossamer wings beat so loud.  The U.S. Trustee misses the Court's

11  question.  Whose ox is (inaudible) here today?  It's not the U.S.

12  Trustee.  There is a system here.  We are meeting the

13  requirements of the bankruptcy code.  It is not the trustee's ox

14  and if the trustee -- apparently he's down to saying, well, there

15  were eight creditors who didn't vote for this plan, so never mind

16  the 300-plus that voted.  There's eight and I will fight for

17  them.  And I think there's no evidence that those eight are

18  sitting home cheering for Mr. Weiss.  There's no evidence that

19  they need protection whatsoever.

20        Going on to the feasibility.  I -- the arguments that I

21  heard today were a lot like the cross-exam and it was the attempt

22  to create testimony, the attempt to create facts.  There was no

23  evidence that there are six other factors in northern Colorado.

24  There was no evidence about the market or where the interest

25  rates are going.  That is all what would like -- they would like

 1  to have -- Mr. Weiss would like to have, but that didn't --

 2  that's not the competent evidence before the Court.

 3          He misinterprets the Jessop & Company deal as somehow

 4  leaving the albatross on the debtor.  The amendment provides that

 5  we will be paid from recoveries, primarily from a net proceeds

 6  from recoveries that were never in the budget.

 7          I think what I heard primarily when you get down to it

 8  was a brilliant indictment of Chapter 11.  Chapter 11 doesn't

 9  work because it is so painful to be there.  How could anybody --

10  they're going to have a bad reputation.  They're going to have a

11  bad name.  Nobody wants to do business with them.  They're going

12  to come out.  Well, I think -- well, it's up to us to try and use

13  what Chapter 11 was meant to do, which was to rehabilitate and

14  this debtor needs -- needed rehabilitation, but it wasn't the

15  kind of rehabilitation where we've got oodles of secured debt and

16  multiple tiers like that.  It had a lot of other issues and I

17  think we have gone a long way to rehabilitate, to avoid the

18  chaos, to posture this debtor in the best way forward going

19  forward.

20          The -- a typical example of the, in essence, parade of

21  potential horrors in the future was -- Mr. Weiss's reference to

22  Section 3613, which talks about a lien in the event of a

23  conviction.  Well, it's not really a lien in the event of a

24  conviction.  It's a lien in the event that there is a fine

25  assessed.  So, now we have a hypothetical defendant being -- with

1   a hypothetical criminal charge that results in a hypothetical

2   fine that now results in a hypothetical lien.  I guess that could

3   have an impact, a big impact, but that's -- it's all

4   hypothetical.  This plan -- the part of the company that we

5   presented with projections does not depend on litigation.  It is

6   enhanced by litigation, but it is not -- does not depend on that.

7           Now, a little side tour, a trip down the capital area

8   that has to deal with the assignments.  So what?  The plan is not

9   -- it is a -- putting it, perhaps, in a better litigation

10  posture, but the plan doesn't live or die on assignments.  Aspen

11  Limousine doesn't go into a claim's assignments as a problem with

12  a solicitation.  It deals with solicitation of plans, not claim

13  assignments, otherwise we'd have LSI and Argusy (ph) and all

14  those other companies that do claim solicitations would be in big

15  trouble.  This has got nothing to do with a plan.  And they

16  claim, yes, there was an assignment and there was a solicitation

17  of that, but that -- it was completely different than the

18  solicitation of votes and there was a disclosure statement in

19  existence.

20          Now, I think that the final thing we talked about

21  earlier, Mr. Weiss said the payments are speculative under this

22  plan.  Well, not really.  There aren't any pay -- as Ms. Wolf-

23  Smith pointed out, these creditors are getting stock.  There are

24  cash flows.  They vary.  No one denies that they have a certain

25  amount of variability.  They do annualize out.

1        In Ray Rusty Jones did not hold as a matter of law that

2   stock -- a ten stock interest is worthless.  It just didn't hold

3   that.  That's not what that case stands for.  And there's been no

4   evidence, nobody has put on any expert, any witness at all to

5   testify to the value of this stock today.  We have evidence, they

6   have no evidence.  The debtor, they say, has promised nothing.

7   Well, the debtor has promised to go forward as a business with

8   its shareholders under corporate law with a board of directors

9   governed by the creditors.  I think it is a small business; it

10  deserves a chance.

11       Thank you, Your Honor.

12       THE COURT:  Thank you.  Well, I think that winds us up

13  on this.  I am going to recess and ask you to return at 4:00 and

14  we'll rule on the quest to confirm the plan, objections, and

15  motion concerning the settlement.  The -- I don't think the

16  ruling will require much more than a half an hour.  We'll see

17  where we are then and if we'll take final argument at that point

18  or won't on the trustee's pending motion.

19       We'll be in recess until 4.

20       THE CLERK:  All rise.

21       (WHEREUPON, the Court took a short recess.)

22       THE COURT:  Please be seated.

23       We are reconvened in the Blue Bear Funding, LLC

24  proceedings.  The Court has before it the plan proponents

25  application for confirmation of the second amended plan of

reorganization proposed by the debtor and Creditor's Committee in
this case.  It's dated and filed June 8th, as modified today,
August 4th pursuant to a section 1127(a) of the bankruptcy code
and objections filed by variance parties in interest.

         The Court also has before it the debtor's motion
seeking approval of a settlement or settlements contemplated by
the plan and is between the debtor, seven independent factoring
companies and individual members of the Creditor's Committee.
That settlement, after notice to all parties and interest, has an
objection and has been filed by the United States Trustee.

         Adequate notice of each of these matters has been duly
given.  And the Court has jurisdiction over these matters
pursuant to 28 USC Section 1334(a) and (b) and 28 USC Section
157(a) and (b)(1).  And they -- these are core proceedings
pursuant to 28 USC Section 157(b)(2).

         In the past three days, the Court has taken evidence
and heard argument on these matters and at this point will make
findings and conclusions and rulings on both.

         The debtor came to Chapter 11 with a very questionable
history concerning methods of raising capital, conflicts of
interest, poor accounting, and other serious management problems.
Evidence supports this Court's conclusion that present management
of the debtor was not the architects of the gross mismanagement,
breaches of fiduciary duty, and/or fraud in raising capital and
operating this business that has resulted in millions of dollars

1    of losses of the savings of hundreds of individual investors.

2    The evidence supports the plan proponent's contention that Mr.

3    Davis and his modest management team of three or four that remain

4    now were, in fact, the whistle blowers, not the perpetrators of

5    the cruel schemes carried out by this debtor and at least some of

6    its principals and their affiliates before this Chapter 11 case

7    was filed in August of last year.

8           This case was filed to shine a light on this company's

9    operations in the past.  The case was filed in good faith.  The

10   case was conducted in good faith and full cooperation of

11   management and professionals of the debtor with creditors and the

12   plan has been proposed in good faith.

13          Much has been accomplished in the course of this

14   Chapter 11.  Past irregular conduct of the business has been put

15   front and center and on the table.  From the first days in

16   Chapter 11, the debtor in possession said it came to Chapter 11

17   in order to expose and to try to fix the improper conduct of its

18   business.  And the evidence is that it has been fully earnest and

19   open in trying to do this.

20          The debtor has worked openly and comprehensively with

21   its creditors.  The debtor, but for extraordinary bankruptcy

22   expenses, has shown a modest profit in Chapter 11.  The debtor

23   has engaged in full disclosure and not made unreasonable promises

24   to its creditors during this case or in the proposed plan.  The

25   debtor has employed professionals, attorneys and accountants, who

 1    have provided much needed advice and investigative help.  They've

 2    understood their obligations to creditors in the bankruptcy

 3    process.

 4            The debtor has garnered the overwhelming support of its

 5    creditors by making radical changes in its management and methods

 6    and veracity of doing business.  The debtor has ceded control of

 7    this enterprise upon confirmation to its creditors.  The debtor

 8    has radically adjusted its financial record keeping and financial

 9    practices and procedures having written off something in excess

10    of $10 million, established procedures for reserves of bad debt,

11    improved underwriting practices in its factoring, and engaged in

12    comprehensive reporting and regular cash in accounts receivable

13    monitoring.

14            These accomplishments notwithstanding, this Court has

15    serious reservations on the basis of this record about the

16    viability of this reorganized debtor as an operating company

17    going forward.  The financial projections going forward are based

18    on some assumptions that simply are not likely to happen.  The

19    evidence is that to survive and to grow and be profitable the

20    reorganized debtor must have more capital.  The evidence is that

21    it has no new equity in its plans.

22            It is unbankable for institutional borrowing purposes

23    and isn't likely to be so for years, according to its own

24    estimates.  It has no private lending lined up, committed, or

25    even on the drawing board or even in negotiations.  Yet it

1   projects the availability of a steady stream of available

2   capital.  The company has shrunk, not grown, in the course of

3   Chapter 11.  It has missed its projections and today its

4   operations have reduced to seven active customers.

5           It projects that it must have additional capital at a

6   cost of approximately 8.5 percent with a loss rate of seven

7   percent and with a return on factored dollars of 40 percent.

8   Without new money, the debtor acknowledges it will likely lose

9   business and its business plan will be substantially impaired.

10  Further sources on this record of the Court's concern about the

11  viability of this debtor going forward.

12          The debtor's management team is very lean.  So lean it

13  may lack the resources to survive in the very hard ball

14  challenging business of factoring unbankable customers.  Mr.

15  Davis has brought much to this company, but among what he brings,

16  experience in factoring in capital markets and raising money, is

17  largely missing.  The key bookkeeper of this company is about to

18  resign and has not been replaced.  The total employee force is

19  down to three and a half or four full-time workers.

20          While disclosure of risks and lack of assurances has

21  been properly handled in this case, it is apparent that

22  unreasonable expectations are far from missing.  Mr. Davis

23  expects to raise $300,000 in the next five months from yet

24  unidentified sources.  The plan proponents project collection of

25  $1.1 million within the next six months on an account receivable.

1    It is in the very early stages of complex litigation in this

2    Court concerning that very account.

3         Mr. Davis believes, in time, the investor creditors

4    will fully recover their investments from the reorganized

5    debtor's operations.  They have a long way to go.  The debtor's

6    present cash on hand is $23,000.

7         (Pause.)

8         THE COURT:  Turning to the objections that are before

9    the Court.  One objection has been made by one of the independent

10   factoring companies, Sierra Factoring.  That objection has been

11   withdrawn in the course of the proceedings in the last three

12   days.

13        The next objection is made by Mr. Karst and Nationwide

14   Cash Flow Specialist.  I'm overruling Mr. Karst and Nationwide

15   Cash Flow Specialist's objection.  It is primarily an objection

16   on adequate information provided about the financial condition

17   and projections of the company.  To begin with, this Court has

18   ruled approximately six weeks ago that the disclosure made in

19   order for solicitation approval of this plan does, in fact,

20   contain adequate information.  This objection, on that basis, is

21   simply too late.  Apart from that, it is also on this record,

22   simply without a merit.

23        Steven Collins, of Sample & Bailey, the certified

24   public accountant who has been engaged in the course of these

25   proceedings by the debtor, was aggressively cross-examined on the

projections and financial records and financial procedures in the
course of this 11 -- in the Chapter 11 plan.  That cross-
examination demonstrated, as is properly disclosed, that there
are very high risks to the assumptions underlying the projections
that this debtor can rise from the ashes as a reorganized company
and return to the creditors their investment from its operations.
I have addressed those assumptions.

In fact, Mr. Collins was very candid about those
assumptions and said if he were able to audit this company, this
new debtor, he would only be with a (inaudible) concern
qualification.  But Mr. Karst's effort to discredit the debtor in
possession's account with regard to this and other matters as
simply on this record ineffective.  The objection of Mr. Karst
and Cash Flow or Nationwide Cash Flow Services, as I say, is
overruled and on this record without an error.

That leaves the objection of the United State's
Trustee.  And I don't have any comment because the United States
Trustee's Office has participated very applicably (sic) (ph) and
aggressively and has come somewhat under attack because this is a
plan that relies heavily on the business judgment of the people
whose money is at stake.  And -- but let me just say that --
before I go on with the opinion, and this was a bit of an aside,
but it's a very important aside to this Court.  Is that the
active participation in a case like this in the United States
Trustee's Office where there are small investors, and it was

1   pointed out by Ms. Wolf-Smith it is always the case that people

2   can step forward when the stakes are investor by investor not

3   great.  And in a case like that, if the U.S. Trustee doesn't take

4   an active position apart from where we come out on that position

5   or about to come out on that position -- if the U.S. Trustee does

6   not take the position of looking and giving its best judgment on

7   these things, the Court is left to doing that in a non-adversary

8   proceeding and I can simply assure you that that makes the

9   Court's task very complicated.  And apart from the outcome, I

10   just want to go on the record as saying how important it is to

11   the Court and how, in my estimation, it is very much a part of

12   what the Congress had in mind in 1978 when the initial office was

13   created to perform the exact function, regardless of the outcome

14   of objections that has been performed by the U.S. Trustee's

15   Office and enough said, but it is a role that is very important

16   to the Court.

17        The U.S. Trustee has characterized this plan as a plan

18   that is a hope and a prayer, a plan that is not feasible and Mr.

19   Weiss has given us the image of the dingy towing the aircraft

20   carrier from early in this case.  The U.S. Trustee has taken the

21   position that this may be the final act in the tragedy of these

22   investors where some may have been defrauded and that that is not

23   what the Chapter 11 plan should do.

24        Finally, the U.S. Trustee's objection has argued that

25   this plan will not offer these investors or the creditors in this

1  company that as much as they might expect to receive in Chapter

2  7.

3        (Pause.)

4        THE COURT:  Very important in the Court's ultimate

5  conclusions on this plan are a number of things.  First, this

6  plan does not project a distribution or return as such to the

7  creditors.  This is not a plan that promises a payback by way of

8  any timetable for funds to -- the general creditor class and make

9  up most of the parties in interest, both in number and amount.

10       I think the question of feasibility, which has been

11 much of the focus of the evidence in the past two and a half days

12 is treated effectively by the plan by virtue of the fact that

13 this plan does call for liquidation in the judgment of the people

14 who will own the company, the creditors, if that, in fact, is

15 what their business judgment calls for and it specifically calls

16 for looking at that at least on a quarterly basis.  In that

17 sense, the Court is persuaded by the Creditor's Committee

18 argument that this plan is inherently feasible.  Feasibility

19 isn't an absolute requirement in 1129(a) in the sense that

20 1129(a) says feasibility means that the case is not likely to be

21 back in the bankruptcy court for liquidation or reorganization

22 unless it contemplates a liquidation, which is exactly what this

23 plan contemplates if, as this Court -- I won't say suspects, but

24 as this Court feels there is a very real possibility that this

25 company will not overcome what lies ahead and that the

1    assumptions that I've articulated some concern about will turn

2    out not to be real.  But what is terribly important, and this

3    case would never be this far, but for the fact of the very

4    comprehensive disclosure in this regard in the bankruptcy

5    process.  One cannot look at the disclosure statement without

6    coming to the conclusion or listen to the testimony of -- and the

7    arguments of the proponents without realizing that all is being

8    offered on an operating basis is a very long shot that the dingy

9    will make it to the shore with the aircraft carrier in tow.

10          Going forward, this plan provides that the creditors

11   are fully in charge.  This plan provides nothing for the present

12   owners and the managers of this company.  The creditors have

13   overwhelmingly supported this plan after comprehensive and fair

14   disclosure.  This reorganization and this reorganized debtor may

15   well be only in the position of the litigation business six

16   months from now with a $500,000 budget controlled by its present

17   creditors.  But even if that is the case, this record supports

18   that this may well be a better option than Chapter 7 where a

19   Chapter 7 trustee would be the steward of such litigation would

20   have to gear up all over again with professionals and an

21   independent evaluation of what these claims are worth and would

22   likely spend the $500,000 on Chapter 7 and accrue Chapter 11

23   administrative expenses.  And the evidence also supports that the

24   few assets that the debtor has, the factored accounts, may be

25   adversely impacted upon this case being liquidated in Chapter 11.

1          The Court concludes on the basis of the evidence

2    presented today and the findings that I've made that this Chapter

3    11 plan, as proposed and modified, meets the requirements of

4    Section 1129(a) of the Bankruptcy Code; that the plan needs to

5    fill it -- feasibility requirement, including the plan's

6    provisions for possible liquidation as determined by its

7    controlling board made up of its present creditor's

8    representatives; and that the plan complies with Title 11.  This

9    is not a regulated company.  I don't know if it is only a

10   creditor and a class has voted no in an accepting class that has

11   standing to raise the best interest issue, but whether or not

12   that is the case, I will find that this record supports that such

13   a creditor will receive more in value as a participant in the

14   equity of the reorganized debtor likely will receive more value

15   than would be received in a Chapter 7.

16          I will find that -- I conclude that the plan is fair

17   and equitable to impaired classes who have rejected the plan;

18   that the requisite disclosure with respect to management going

19   forward in compensation, as it relates to past management, has

20   been made on this record; that the requisite votes have been

21   obtained, except as to those who have -- are impaired that voted

22   no and are treated fair and equitable under Section 1129(b).

23   Furthermore, the plan provides for payment of administrative

24   claims either as required by the statute or in accordance with

25   the agreement of the claimants or pending final resolution of

 1   claims if they are of the nature that require Court approval or

 2   are presently contested.

 3           I will and have actually signed an order confirming the

 4   plan and then where we're directing the notice of confirmation be

 5   given.  That will be docketed -- Jane, can that be docketed

 6   today, still?

 7               THE CLERK:  I'm sorry.

 8               THE COURT:  Can we docket an order yet this afternoon?

 9               THE CLERK:  I can do it after (inaudible)>

10               THE COURT:  That will be docketed as of today's date

11   and is dated as of today's date.

12           That leaves the settlement agreement and the Court will

13   approve the settlement agreement.  The plan contemplates the

14   settlement agreement as part of it.  It may not -- however, it

15   required as such, but on the basis of the evidence and in support

16   of the settlement agreement and that in opposition to it from the

17   United States Trustee's Office.  I find that the settlement

18   agreement is fair and equitable and in the best interest of this

19   debtor's estate and its creditors.  And it is the creditor body

20   as a whole and the debtor and this estate that it must be in the

21   best interest and fair and equitable to.

22           I don't know if it's fair and equitable to the

23   investors, but that isn't the criteria -- it isn't the investor's

24   bankruptcy that I am asked or must weigh the settlement from the

25   perspective of other than this estate that the creditor body as a

 1   whole and the debtor itself.  The terms of this, I think, are

 2   very favorable to the debtor and the debtor's creditor body as a

 3   whole.  I mean it -- the exchange of claims for the cash on hand

 4   and the seven IFCs that are participants in the settlement

 5   agreement is a result that I think is well within a business

 6   judgment to this debtor in possession to settle for when applying

 7   the criteria that are prescribed by the 10th Circuit case law.

 8   The risk and litigation, I'm not sure that the result of the

 9   settlement gives this estate, without the risk of litigation,

10   much of what it might hope for in litigation.

11          Certainly the issue of collection is a real one.  The

12   ability of the estate to collect, net of the cost of collection,

13   from the IFCs wrestling with the avoidance defenses, wrestling

14   with a multitude of claims that it would involve.  Certainly the

15   issues of collectability of what one recovers compared to what

16   the settlement gives is an element that can favor the settlement

17   from view from the perspective of the debtor and its creditor

18   body as a whole.  The cost and complexity of the avoidance

19   litigation or other claims that might exist in favor of the

20   debtor, although I'm not quite sure what those claims might be

21   other than the avoidance litigation, but the cost and complexity

22   of avoidance litigation is certainly a good question and that is

23   -- weighs in favor of the settlement.

24          The interest of creditors and the reasonable exercise

25   of their judgment?  Well, that's the one thing that gives me some

1    (inaudible).   On the other hand, with the record before the Court

2    indicates that the creditors themselves, who have spoken on this

3    issue, have met the idea with enthusiasm notwithstanding the fact

4    that the settlement makes the funds that are held by the IFCs --

5    by the seven IFCs one further step removed from those creditors

6    and those investors and the opportunity to go after directly.

7    But I'm not sure -- that the record also indicates that there may

8    be very good sense in the investor's support of this arrangement

9    simply because the efficiency of them having the kinds of claims,

10   which many of them are apparently had on this record have been

11   assigned to the debtor, in the hands of the debtor, and the

12   spoils of what's left of the investor's investment that would be

13   in the IFCs and might be through a multitude of litigation and

14   reconstruction and accounting cause some of those funds to reach

15   the investors directly with the cost of that.   Again, a business

16   judgment that may well outweigh the benefits of concentrating the

17   effort on behalf of all of the investors.

18        The U.S. Trustee points out that we've got something

19   that begins to look like a defacto substantive consolidation, I

20   think, and that's a point well taken, but from the perspective of

21   the debtor in settling with the IFCs, I find that this settlement

22   is more than fair and equitable and in the best interest of the

23   debtors.   So, I will overrule the U.S. Trustee's objection.

24        (Pause.)

25        THE COURT:   And sign the order that has been tendered

1   approving the settlement agreement.

2           The last piece of business, Mr. Jessop, is I'm ordering

3   you to hang onto the original exhibits.  So, if you would,

4   please, come forward with pen in a hand and acknowledge that

5   you're taking the --

6           MR. JESSOP:  I was going to request that you order Ms.

7   White, but I'll do it, Your Honor.

8           THE COURT:  We set it up for your signature on the --

9   (inaudible) concerned with which of this stuff that --

10          MS. WOLF-SMITH:  That would be nice.

11          THE COURT:  When we're done, I want you to hold this.

12  There is the order.  Has the amended or the modified plan red

13  marked version of which was given the Court been filed?

14          MR. JESSOP:  No.

15          MS. WOLF-SMITH:  No, I haven't filed it yet, no.

16          MR. JESSOP:  The clean copy?  No, sir.

17          MS. WOLF-SMITH:  No.

18          THE COURT:  Would you please give Ms. Purdy (ph) a copy

19  of that?  And we'll file and docket that, as well, so that the

20  record will be complete.  I refer to modifications in the order

21  that are today's date.  I hope you have a clean copy of that.

22          MR. JESSOP:  I think the only thing it's going to need

23  is some executing -- executed --

24          THE COURT:  Well, when I leave the bench very soon you

25  can do that and please give it to Ms. Purdy.  I will also enter

1    an order confirming the plan and an order for service of notice

2    of the order confirming their plan.

3            MR. JESSOP:  Your Honor, should we change the date on

4    it to bring it forward on the -- right now it still says the plan

5    of June 8th.

6            THE COURT:  Well, the order says the plan of June 8th -

7    -

8            MS. WOLF-SMITH:  Okay.

9            THE COURT:  -- as modified --

10           MS. WOLF-SMITH:  Okay.

11           MR. JESSOP:  Just leave it.

12           MS. WOLF-SMITH:  Okay.

13           THE COURT:  -- August 4th, so I'll let you figure that

14   one out and that's what you're going to get confirmed.

15           It's been a week where you've all -- working on -- hard

16   at this and I appreciate the fashion in which all of you have

17   worked on it and I think this case has seen some real hardship on

18   the part of the parties in the interest and there's no

19   (inaudible) going forward, but I think it's been -- there's been

20   full disclosure.  People are going forward with their eyes wide

21   open and I commend those of you who have -- certainly the

22   Creditor's Committee and the management of the company and their

23   professionals have worked long and hard at it and cooperated with

24   each other (inaudible).  I will, again, say the Court is deeply

25   appreciative of the role that Mr. Weiss and his office have

1    played in this.

2           Good day and have a nice weekend.  We'll be in recess.

3           (Court adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    ///

1                        CERTIFICATE

2

3      I hereby certify that the foregoing is a true and correct

4       transcript from the record of proceedings in the above-

5                       entitled matter.

6

7

8

9

10      _____    November 29, 2006

11      Valori Weber

12      Western Deposition and Transcription, LLC

13      3100 Huron Street, 2D

14      Denver, CO  80202

15      303.292.9400

16

17

18

19

20

21

22

23

24

25